Penrod W. Keith (4860)
Peter H. Donaldson (9624)
Cole P. Crowther (16432)
**DENTONS DURHAM JONES PINEGAR P.C.**
111 South Main Street, Suite 2400
PO Box 4050
Salt Lake City, UT  84110-4050
Telephone:  (801) 415-3000
penrod.keith@dentons.com
peter.donaldson@dentons.com
cole.crowther@dentons.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>BENJAMIN RODNEY HULSE,<br><br>    Debtor. | Bankruptcy Case No. 21-20084<br><br>Chapter 7<br><br>Honorable William T. Thurman |
| SWAN PEDIATRIC DENTAL, LLC and<br>MATTHEW A. SWAN,<br><br>    Plaintiff,<br><br>v.<br><br>BENJAMIN RODNEY HULSE,<br><br>    Defendant. | Adversary Pro. No.<br><br>_____ |

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

The Plaintiffs in this action, Swan Pediatric Dental, LLC ("Swan Dental") and

Matthew A. Swan ("Dr. Swan") (collectively, "Plaintiffs"), by counsel, pursuant to the

provisions of 11 U.S.C. §§ 523(a)(4), 523(a)(6), and 727(b); and Rules 4007 and 7001 of the

Federal Rules of Bankruptcy Procedure, request that the Court determine certain obligations of

Benjamin Rodney Hulse ("Defendant" or "Dr. Hulse") to Plaintiffs be nondischargeable.  In

support of their Complaint, Plaintiffs state as follows:

## ALLEGATIONS COMMON TO ALL COUNTS

1.      On January 8, 2021 (the "Petition Date"), Defendant filed in the District Court of

Utah a Petition for Relief under Chapter 7 of the United States Bankruptcy Code in Case No.

21-20084.

2.      Defendant listed his physical address in a written filing with this Court as

1103 South 2230 East, Spanish Fork, UT 84660.  Defendant was represented in the filing of the

Petition for Relief by Theron D. Morrison, whose business mailing address is 290 25th Street,

Suite 102, Ogden, Utah 84401.

3.      Swan Dental is a Utah limited liability company with its principal place of

business in Utah County, Utah and is a creditor of Defendant in his underlying bankruptcy case.

4.      Dr. Swan is an individual residing in Utah County, Utah and is a creditor of

Defendant in his underlying bankruptcy case.

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and this

matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).  Venue is proper under

28 U.S.C. § 1409(a).

6.      On December 19, 2018, the parties executed an Asset Purchase Agreement

("APA"), whereby Defendant sold his dental practice to Swan Dental, with offices in Salem and

Nephi, Utah (collectively, the "Practice"), effective December 31, 2018.  (*See* APA, attached

hereto as **Exhibit A**).

SLC_5370877.4

7.      The total purchase price for the Practice was $1.4 million, over $1 million of which was allocated toward patient goodwill.  (APA §4).

8.      Pursuant to the APA, Dr. Swan did not purchase Dr. Hulse's accounts receivable, but agreed to (and did) remit all payments received on Dr. Hulse's accounts receivable to Dr. Hulse.

9.      Dr. Hulse agreed to use only "legal method[s]" of collection and that in his collection efforts he would "clearly notify the patient that Seller is acting for Seller's own account and not by or on behalf of Purchaser."  (APA §11(D)).

10.      In July 2019, Dr. Swan discovered that Dr. Hulse had sent approximately 294 letters to patients seeking payment on purported accounts receivable that affected 1,047 patients (the "July Letters").

11.      In the July Letters, Dr. Hulse intentionally used misleading language and did not clearly notify patients he was collecting on his own account.  The July Letters were sent without any date and used the "Salem Smiles" and "Nephi Smiles" logos without permission.

12.      The July Letters were not signed by Dr. Hulse but were signed only in the name of "Salem Smiles" and "Nephi Smiles", thereby creating the appearance that they came from Dr. Swan's offices.  They also concluded with the statement "we look forward to serving you in the future"—further implying that Dr. Swan's office sent the letters.

13.      Besides being misleading, many of the July Letters were inaccurate in that they were sent to patients whose insurance had not been billed properly or at all.

SLC_5370877.4

14.    In other instances, the insurance had already paid, but the amount had not been credited to the patient's account.  Some patients stated they had been told by the previous ownership they would not owe any more money and that their account was clear.

15.    Dr. Hulse also erroneously and knowingly sent many patients' accounts to a collections agency even though the patient's insurance had already paid the balance or Dr. Hulse had written off the balance.

16.    Consequently, Dr. Swan's Practice received a barrage of angry phone calls and in-person complaints from patients who believed Dr. Swan or his Practice had sent the July Letters.

17.    Many of these patients attempted to contact Dr. Hulse to remedy the issue, but he refused to provide helpful information regarding their accounts.  In many instances, Dr. Hulse refused to respond at all.

18.    Dr. Hulse's intentional interference with Dr. Swan's Practice by sending the July Letters resulted in Dr. Swan losing a number of patients and prospective patients.

19.    After multiple requests from Dr. Swan to Dr. Hulse that Dr. Hulse stop sending misleading letters and correct any mistakes from the July Letters to minimize confusion and damage to the goodwill of the Practice, Dr. Swan sent a cease and desist letter to Dr. Hulse on August 7, 2019, through his legal counsel.

20.    Dr. Hulse responded through counsel but refused to acknowledge any problem with the July Letters and instead threatened to file a complaint in court if Dr. Swan did not agree to pay him $250,000 or agree to mediate the dispute.

21.    Prior to sending the July Letters, Dr. Hulse had personally visited the Salem office to ostensibly work on his accounts receivable on May 15, 17, 20, and 21, 2019.

4

SLC_5370877.4

22.     During these visits, Dr. Swan and his wife, Kathryn Swan ("Mrs. Swan") each logged Dr. Hulse on to the Salem Smiles Open Dental system while Dr. Swan treated patients because, at that time, Dr. Swan trusted Dr. Hulse.

23.     On one occasion, Dr. Hulse casually mentioned to Dr. Swan he needed to change certain dates in the system, presumably to correct them.  Dr. Swan did not understand what Dr. Hulse was referring to, but he trusted Dr. Hulse.

24.     Dr. Swan later learned that while Dr. Hulse was logged in with Dr. Swan's personal login, Dr. Hulse intentionally manipulated patient records by altering the dates of "payment received" on over 90 of Dr. Hulse's accounts to make it appear as though insurance payments were received in 2019, which Dr. Swan would need to pay to Dr. Hulse.  In reality, these accounts had already received payment from insurance in 2018, prior to the sale of the practices.

25.     Some of the payment dates Dr. Hulse altered corresponded with payments that had been made as part of "bulk checks" from the patient's insurance company.  As a result, in some cases the alterations Dr. Hulse made for a single patient account caused the payment dates to be changed for all patients for whom payments were made on the same bulk insurance check, resulting in discrepancies within payment records for these patients.  As an example, one payment date that was fraudulently altered resulted in over $17,000 that Dr. Swan would have had to pay to Dr. Hulse had the alterations gone undiscovered.

26.     On September 17, 2019, Plaintiffs filed a Demand for Arbitration with the American Arbitration Association ("AAA") against Dr. Hulse and his entity, Hulse Dentistry, LLC.

5

27.    Dr. Hulse had previously filed a complaint against Plaintiffs with the Fourth District Court, State of Utah (Case No. 190401392, the "State Court Case"), ignoring the APA's requirement to arbitrate their disputes. Accordingly, Judge James R. Taylor entered an Order to Stay Pending Arbitration, whereby the parties were ordered to arbitrate their substantive disputes.

28.    On October 24, 2019, the AAA sent a letter to the parties providing notice of the appointment of Langdon T. Owen, Jr., Esq. as the Arbitrator.

29.    In November 2019, while the parties were in the middle of arbitration, Dr. Hulse made the following public post to his Facebook page accusing Dr. Swan of being dishonest, hiding money, acting illegally, and blackmailing Dr. Hulse:

> Friends only, so not breaking any rules, but I'll still be vague. I've had to sue somebody – crazy to me since its [sic] not my personality and never thought I'd be here or be in a lawsuit ever. But the doctor that bought the practices I sold at the end of last year is so incredibly dishonest I have to say something. From his hiding money, outright illegal actions, and, recently, personal blackmail, I was pretty much forced into this. I've never met somebody entirely lacking in integrity while I've been in business and it's depressing. To those that have been affected by this, from the business and accounting, I am so very sorry. If you know somebody with this complaint you can explain, since legal restraints make it hard for me to do anything (this experience is a learning process about the legal system for sure). This is a way of trying to get people out of this and make him cover and answer for things he has done.

30.    Because the offices operated by Swan Dental and Dr. Swan are in relatively small, largely rural communities, many of Dr. Swan's patients and prospective patients viewed or heard about Dr. Hulse's defamatory statements.

31.    The Arbitration Hearing was held July 8, 9, and 10, 2020 in Lehi, Utah, at which time the Arbitrator received evidence and argument.

6

32.     Following post-hearing briefing, on August 27, 2020, the Arbitrator issued his notice of award ("Award" attached hereto as **Exhibit B**).

33.     The Award awarded the following to Plaintiffs against Defendant and Hulse Dentistry, LLC, jointly and severally:

a.   $345,000 for breach of contract and defamation;

b.   Reimbursement of Administrative fees of the AAA totaling $17,630; and

c.   Attorneys' fees and costs in the amount of $310,739.

d.   Total Award amount of $673,369, to bear interest on the unpaid balance from the day after the hearing, July 10, 2020, at the rate of 3.53% per annum.

(*See* Award, pp. 2-3).

34.     The Arbitrator specifically found that the July Letters sent by Dr. Hulse were "misleading and in many cases were in error."  They "caused patients distress and resulted in angry complaints, and damaged the goodwill of the practice."  (Award, p. 3).

35.     The Arbitrator accordingly awarded $345,000 in damages as demonstrated "to a reasonable degree of certainty" by the credible expert evidence offered by the Swan parties (Award, p. 3).

36.     The Arbitrator also found that Dr. Hulse "published false and defamatory statements about [Plaintiffs].  This damaged the reputation and thus the goodwill of [Plaintiffs]." (Award, p. 4).

37.     Accordingly, in addition to $345,000 in damages, the Award also provided for injunctive relief in the form of a permanent injunction ordering Dr. Hulse to refrain from publishing false and defamatory statements about Dr. Swan or his dental practices.  (*Id.*).

38.     The Arbitrator also found that Dr. Hulse "changed patient records in a way, that if not caught, would have increased payments due to the Hulse parties in the turning over of accounts receivable collections to the Hulse parties by the Swan parties.  The explanation offered by the Hulse parties of why the changes should not be seen as improper were not credible." (*Id.*).

39.     On September 14, 2020, Plaintiffs moved in the State Court Case to confirm the Award.

40.     Defendant opposed the motion to confirm the Award and moved to vacate the Award on October 13, 2020.

41.     On December 7, 2020, Judge Taylor heard oral argument on the parties' motions.

42.     On December 23, 2020, Judge Taylor entered an order denying Defendant's motion to vacate the Award and confirming the Award against Defendant and Hulse Dentistry, LLC in the Fourth District Court, State of Utah.  (*See* Order, attached hereto as **Exhibit C**).

43.     Prior to and subsequent to the Petition Date, Dr. Hulse has contacted multiple insurance companies, banks, and police, falsely accusing Dr. Swan of identity theft and other improper conduct that was found to be baseless.

44.     Dr. Hulse has also repeatedly threatened to report Dr. Swan to professional licensing boards to try to have Dr. Swan's license suspended or revoked.

## COUNT I—WILLFUL AND MALICIOUS INJURY
### (11 U.S.C. § 523(A)(6))

45.     Plaintiffs reallege and incorporate by reference the foregoing allegations, the same as if set forth verbatim herein.

46.     Defendant's conduct described above rises to the level of intentional monetary injury to Plaintiffs.

47.     Defendant willfully and intentionally sent the July Letters to damage Plaintiffs' reputation and interfere with Plaintiffs' Practice.

48.     Defendant willfully and intentionally made defamatory posts to his Facebook page regarding Plaintiffs.

49.     Defendant willfully and intentionally disparaged and defamed Plaintiffs to insurance companies, banks, and the police.

50.     Defendant willfully and intentionally altered records in Plaintiffs' dental software to commit a fraud against Plaintiffs.

51.     At all times, Defendant knew that his foregoing conduct would harm Plaintiffs and their business opportunities and he did so with willful and malicious intent.

52.     Defendant is liable to Plaintiffs for willful and malicious injury within the meaning of 11 U.S.C. § 523(a)(6).

53.     The sum of $673,369.00—the total amount of the Award—therefore constitutes a nondischargeable debt of Defendant to Plaintiffs, as Plaintiffs' actual damages relating to Defendant's actions.

### COUNT II—FRAUD OR DEFALCATION IN A FIDUCIARY CAPACITY, EMBEZZLEMENT, OR LARCENY
### (11 U.S.C. § 523(A)(4))

54.     Plaintiffs reallege and incorporate by reference the foregoing allegations, the same as if set forth verbatim herein.

SLC_5370877.4

55.    Defendant's conduct described above rises to the level of fraud and embezzlement.

56.    As set forth above, while entrusted with the accounts receivable and the dental software, Defendant manipulated and altered data with the intent to commit a fraud against Plaintiffs by requiring Plaintiffs to pay Defendant more than he was owed and to harm Plaintiffs' Practice.

57.    Under Utah law, larceny/embezzlement is included in Utah's theft statute—Utah Code § 76-6-404—and provides that theft (including embezzlement/larceny) is committed when a person "obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof."

58.    Plaintiffs entrusted Defendant with access to their dental records and the accounts receivable.

59.    Defendant exercised unauthorized control over the accounts receivable when he intentionally sent improper collection letters, misrepresented the accounts receivable, and manipulated and altered the dental software data.

60.    At all relevant times, Defendant's foregoing conduct was done with fraudulent intent.

61.    The Arbitrator considered Defendant's foregoing conduct when entering the Award.

62.    Defendant is liable to Plaintiff for fraud or defalcation in a fiduciary capacity, embezzlement, or larceny within the meaning of 11 U.S.C. § 523(a)(4), and the sum of

SLC_5370877.4

$673,369.00 is therefore nondischargeable as Plaintiffs' actual damages relating to Defendant's actions.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment (i) declaring Defendant's debt to Plaintiffs to be nondischargeable set forth in the Award and affirmed in the Order pursuant to one or more subsections of 11 U.S.C. § 523(a); (ii) awarding Plaintiff's judgment against Defendant in an amount not less than $673,369.00, plus post-judgment interest and costs of collection and any augmentation in fees which may be granted in the future; and (iii) awarding Plaintiffs such other and further relief as the Court may deem just and proper.

DATED this 12th day of April, 2021.

DENTONS DURHAM JONES PINEGAR P.C.

By:      */s/ Penrod W. Keith*
      Penrod W. Keith
      Peter H. Donaldson
      Cole P. Crowther

      *Attorneys for Plaintiffs*

# EXHIBIT A

SLC_5370877.4

# ASSET PURCHASE AGREEMENT

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

This document is offered to clients as a convenience and for reference purposes only. Any and all advice and/or opinion on the legality, validity, effect, tax and other consequences, as well as any additional provisions or modifications must be provided by each party's attorney. **PARAGON, Inc.** assumes no responsibility for any errors and/or omissions.

**PARAGON, Inc.** advises all clients to have these documents reviewed by their attorney. Attorney fees are a client expense and can vary considerably; **PARAGON, Inc.** assumes no responsibility for attorney fees incurred by a client for the review of these documents.

**THIS IS A LEGAL DOCUMENT.**
**LEGAL, TAX OR OTHER COUNSEL SHOULD BE CONSULTED BEFORE SIGNING**

**NOTICE IS GIVEN THAT THE TERMS AND CONDITIONS OF THIS AGREEMENT ARE SUBJECT TO MEDIATION AND BINDING ARBITRATION**

© COPYRIGHT 2018 BY PARAGON, INC. ALL RIGHTS RESERVED

These documents constitute a trade secret of **PARAGON, Inc.** and are, and shall remain, its exclusive property. Neither party may make copies of any of the information, ideas, procedures, practices, programs, concepts, contracts, summaries and/or other tangible data conveyed and entrusted to them, or use these contracts or any portion thereof for any other purpose without the prior written consent of **PARAGON, Inc.** The unauthorized use of these documents would be considered unfair competition and would constitute a fraudulent act.

All rights reserved. No part of this Agreement or the attached Addenda may be reproduced or utilized in any form or by any means, electronic or mechanical, including photocopying, recording or by any information storage and retrieval system, without permission in writing from **PARAGON, Inc.**

As a condition of the use of this document or the use of any other documents provided to the parties by PARAGON, no references to PARAGON contained herein may be deleted and/or altered in any manner.

.072803032602.181025.120103.0103

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

# ASSET PURCHASE AGREEMENT

# TABLE OF CONTENTS

SECTION                                                                                                    PAGE

ASSET PURCHASE AGREEMENT ........................................................................... 1
1.   SALE OF ASSETS ...........................................................................1
2.   PURCHASE PRICE...........................................................................2
3.   METHOD OF PAYMENT ...................................................................2
4.   ALLOCATION OF THE PURCHASE PRICE ......................................2
5.   SIGNATURE DATE AND CLOSING...................................................3
6.   DATE OF POSSESSION ...................................................................3
7.   INSPECTION OF ASSETS AND EXAMINATION OF TITLE.............3
8.   BILL OF SALE....................................................................................4
9.   TAXES................................................................................................4
10.  PRO-RATED EXPENSES..................................................................4
11.  ACCOUNTS RECEIVABLE LOAN AND PURCHASER PROMISSORY NOTE ...............5
12.  SELLER WARRANTIES.....................................................................7
13.  PURCHASER WARRANTIES.............................................................9
14.  USE OF SELLER'S NAME................................................................11
15.  ANNOUNCEMENTS .........................................................................11
16.  PATIENT RECORDS ........................................................................11
17.  EXPENSES ......................................................................................12
18.  ATTORNEYS AND DOCUMENTS....................................................12
19.  INDEMNIFICATION .........................................................................12
20.  INTEGRATION.................................................................................14
21.  CHOICE OF LAW AND VENUE ......................................................14
22.  BINDING EFFECT, ASSIGNMENT...................................................14
23.  SEVERABILITY................................................................................15
24.  NOTICE AND PUBLICATIONS.........................................................15
25.  WAIVER OF BREACH OR VIOLATION NOT DEEMED CONTINUING .........................15
26.  SURVIVAL OF SPECIFIC PROVISIONS..........................................15
27.  CONSTRUCTION .............................................................................16
28.  NOMENCLATURE............................................................................16
29.  MEDIATION AND ARBITRATION.....................................................16
30.  ITEM HEADINGS AND INTERPRETATION......................................17
31.  PERSONAL GUARANTY OF SELLER..............................................17
32.  PERSONAL GUARANTY OF PURCHASER .....................................17
33.  OTHER PROVISIONS OR MODIFICATIONS ...................................17

ADDENDUM ....................................................................................................... 19
EQUIPMENT, FURNITURE AND FIXTURES ...........................................19

ADDENDUM ....................................................................................................... 20
ITEMS EXCLUDED FROM SALE.............................................................20

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

ADDENDUM ............................................................................................21
    BILL OF SALE.................................................................................................21


ADDENDUM ............................................................................................22
    RESTRICTIVE COVENANT AGREEMENT ..............................................22
    1.   GOODWILL COVENANT........................................................................22
    2.   NON-SOLICITATION .............................................................................23
    3.   LIQUIDATED DAMAGES........................................................................23
    4.   WAIVER OF RIGHT TO PROTEST.......................................................24
    5.   SPECIFIC PERFORMANCE...................................................................24


ADDENDUM ............................................................................................25
    ACCOUNTS RECEIVABLE PROMISSORY NOTE....................................25
    TABLE OF PAYMENTS AND CREDITS....................................................27


ADDENDUM ............................................................................................31
    PROFESSIONAL OFFICE LEASE AGREEMENT SALEM OFFICE ...........31
    1.   PREMISES.............................................................................................31
    2.   TERM ....................................................................................................31
    3.   RENTAL AND SECURITY .....................................................................31
    4.   UTILITY BILLS AND AD VALOREM TAXES ...........................................31
    5.   USE OF PREMISES...............................................................................32
    6.   ABANDONMENT OF LEASED PREMISES..............................................32
    7.   REPAIRS BY LANDLORD AND LANDLORD EXPENSES.......................32
    8.   REPAIRS BY TENANT AND TENANT EXPENSES.................................32
    9.   PROPERTY TAXES AND INSURANCE..................................................33
    10.  DESTRUCTION OR DAMAGE TO THE PREMISES .............................33
    11.  INDEMNITY............................................................................................33
    12.  GOVERNMENTAL ORDERS..................................................................34
    13.  CONDEMNATION...................................................................................34
    14.  ASSIGNMENT AND SUBLETTING .......................................................34
    15.  REMOVAL OF EQUIPMENT AND TRADE FIXTURES...........................34
    16.  SECURITY INTEREST ..........................................................................35
    17.  CANCELLATION OF LEASE BY LANDLORD.........................................35
    18.  RELETTING BY LANDLORD..................................................................35
    19.  MORTGAGEE'S RIGHTS .......................................................................36
    20.  NO ESTATE IN LAND............................................................................36
    21.  HOLDING OVER.....................................................................................36
    22.  ATTORNEYS' FEES AND COSTS .........................................................36
    23.  SERVICE OF NOTICE ...........................................................................36
    24.  WAIVER OF RIGHTS ............................................................................36
    25.  DEFINITIONS.........................................................................................36
    26.  RIGHT OF FIRST REFUSAL .................................................................36
    27.  OPTION TO PURCHASE.......................................................................37
    28.  LEASE RENEWAL.................................................................................37
    29.  MUTUAL RELEASE AND WAIVER .......................................................37
    30.  DEATH AND DISABILITY OF TENANT..................................................37
    31.  ADDITIONS AND MODIFICATIONS.......................................................38

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

ADDENDUM ................................................................................................................... 39
   PROFESSIONAL OFFICE LEASE AGREEMENT NEPHI OFFICE ............................................ 39
     1.   PREMISES ............................................................................................................. 39
     2.   TERM .................................................................................................................... 39
     3.   RENTAL AND SECURITY ......................................................................................... 39
     4.   UTILITY BILLS AND AD VALOREM TAXES ............................................................... 39
     5.   USE OF PREMISES ................................................................................................ 40
     6.   ABANDONMENT OF LEASED PREMISES.................................................................. 40
     7.   REPAIRS BY LANDLORD AND LANDLORD EXPENSES............................................... 40
     8.   REPAIRS BY TENANT AND TENANT EXPENSES ...................................................... 40
     9.   PROPERTY TAXES AND INSURANCE ....................................................................... 41
     10.  DESTRUCTION OR DAMAGE TO THE PREMISES .................................................... 41
     11.  INDEMNITY........................................................................................................... 41
     12.  GOVERNMENTAL ORDERS..................................................................................... 42
     13.  CONDEMNATION................................................................................................... 42
     14.  ASSIGNMENT AND SUBLETTING ........................................................................... 42
     15.  REMOVAL OF EQUIPMENT AND TRADE FIXTURES.................................................. 42
     16.  SECURITY INTEREST ............................................................................................ 43
     17.  CANCELLATION OF LEASE BY LANDLORD.............................................................. 43
     18.  RELETTING BY LANDLORD..................................................................................... 43
     19.  MORTGAGEE'S RIGHTS ........................................................................................ 44
     20.  NO ESTATE IN LAND............................................................................................ 44
     21.  HOLDING OVER.................................................................................................... 44
     22.  ATTORNEYS' FEES AND COSTS ............................................................................ 44
     23.  SERVICE OF NOTICE ............................................................................................ 44
     24.  WAIVER OF RIGHTS ............................................................................................. 44
     25.  DEFINITIONS........................................................................................................ 44
     26.  RIGHT OF FIRST REFUSAL .................................................................................... 44
     27.  OPTION TO PURCHASE......................................................................................... 45
     28.  LEASE RENEWAL ................................................................................................. 45
     29.  MUTUAL RELEASE AND WAIVER ........................................................................... 45
     30.  DEATH AND DISABILITY OF TENANT...................................................................... 45
     31.  ADDITIONS AND MODIFICATIONS.......................................................................... 46

ADDENDUM ................................................................................................................... 47
   UNCONDITIONAL GUARANTY .......................................................................................... 47

ADDENDUM ................................................................................................................... 48
   PERSONAL ACKNOWLEDGEMENTS AND WARRANTIES........................................................ 48

ADDENDUM ................................................................................................................... 49
   ADDITIONAL PROVISIONS AND MODIFICATIONS................................................................. 49

ADDENDUM ................................................................................................................... 50
   COMPANY RESOLUTION.................................................................................................. 50

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Asset Purchase Agreement") is entered into on
December 19th , 2018, (hereinafter referred to as the "Signature Date") by and between
Benjamin R. Hulse, D.D.S. and Hulse Dentistry , LLC (jointly and severally hereinafter referred to as "Seller"
or "Dr. Hulse", either term as used herein including reference to the other), and Swan Pediatric Dental, P.C.
(hereinafter referred to as "Purchaser").

WHEREAS, Seller operates a general dentistry practice (the "Practice") located at 601 N State Rd #198,
Salem, UT 84653 and 54 N Main St., Nephi UT 84648 (hereinafter jointly referred to as the "Premises"); and
Seller, in furtherance of this Asset Purchase Agreement, desires to sell and/or assign to Purchaser all
Seller's right, title and interest in and to the assets of the Practice (as described in Section 1 below,
collectively hereinafter referred to as the "Assets"); and

WHEREAS, Purchaser desires to purchase Seller's interest in the Assets; and

WHEREAS, the parties acknowledge that this Agreement has been provided by PARAGON, Inc., a
Mississippi corporation, ("PARAGON") to assist the parties and their respective attorneys with the completion
of this transaction.

NOW, THEREFORE, in consideration of the premises and the parties' respective promises, representations,
covenants and warranties, the performance of each unto the other, and other good and valuable
consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    SALE OF ASSETS
Upon the terms and subject to the conditions herein, Seller agrees to sell and Purchaser agrees to
purchase all of Seller's right, title and interest in and to all of the Assets owned and or used by Seller
in the operation of the Practice (other than those specifically excluded and identified on the attached
"ITEMS EXCLUDED FROM SALE" addendum, which shall remain with Seller following the
hereinafter defined Closing) including without limitation the following Assets:

A. EQUIPMENT
All clinical, lab and office equipment (other than telephone equipment, if leased) located on the
Premises on the Signature Date, including but not limited to those listed on the attached
"EQUIPMENT, FURNITURE AND FIXTURES" addendum and including all software and
software license, if transferable, related to or used in connection with any such equipment and/or
the Practice.

B. OFFICE FURNITURE AND FIXTURES
All office furniture, furnishings and trade fixtures located on the Premises on the Signature Date,
including but not limited to those listed on the attached "EQUIPMENT, FURNITURE AND
FIXTURES" addendum.

C. CLINICAL AND OFFICE SUPPLIES
All clinical supplies and instruments, all paper goods and the office supplies located on the
Premises on the Date of Possession (as hereinafter defined); Dr. Hulse agrees to have a usual
and customary inventory of supplies on hand on the Date of Possession.

D. MISCELLANEOUS ASSETS
Subject to any and all applicable regulations relating to transferability and to the extent of Seller's
interest, the records of all active and inactive patients of the Practice ("Patient Records"), all
telephone numbers and any related yellow page ads, all practice-related website domain names
and Uniform Resource Locators (URL), all practice-related social media accounts (if any), all

SELLER
INITIAL 

PAGE 1

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

advertising and promotional material, all professional employee contracts (if any), all managed care contracts (if any), and all other miscellaneous tangible and intangible non-cash Assets of the Practice that have not been specifically excluded from this sale and listed on the attached "ITEMS EXCLUDED FROM SALE" addendum.

E. GOODWILL

The personal goodwill of the Practice that was established by Dr. Hulse.

F. GOODWILL COVENANT

As a specific condition of the purchase of the aforementioned goodwill, Dr. Hulse agrees to be bound by the terms of the Restrictive Covenant as described in the attached "Restrictive Covenant Agreement" addendum.

G. EXCLUDED ASSETS

All cash Assets of the Practice such as checking and savings accounts, accounts receivable, security deposits (including office lease deposits), petty cash, cash on hand, retained earnings, pension and/or profit sharing plan, and insurance premium refunds are excluded from this sale. All automobiles, real estate, personal items such as professional plaques, books, personal stationery, documents (other than any contracts and/or agreements assumed) and all insurance policies (including but not limited to, malpractice insurance, casualty insurance, liability insurance and any and all other insurance policies maintained in connection with the Practice) are the sole property of Seller and are excluded from this sale. In addition, any other Assets of the Practice which are specifically noted on the attached "ITEMS EXCLUDED FROM SALE" addendum are also excluded from this sale (collectively referred to as "Excluded Assets"). If Seller's telephone equipment is leased through a third party, and if Purchaser continues to operate the Practice at its current location after the Closing, then Purchaser agrees to assume that telephone equipment lease for use following the Date of Possession. In addition, should there be any charge for transferring a license for the use of any computer software used by Seller (if applicable), then such cost of that transfer shall be paid by Purchaser. Except for the Excluded Assets described in the attached "ITEMS EXCLUDED FROM SALE" addendum, Seller's interest in all other items used for the operation of the Practice and located on the Premises after the Closing Date (including the office lease, any trade-specific leasehold improvements, and any resale goods, if applicable) shall be conveyed to Purchaser through this Asset Purchase Agreement, whether such interest is joint or several, corporate or individual, proprietary or leased (to the extent assignable).

2.   PURCHASE PRICE

The purchase price for the Assets (the "Purchase Price") shall be ONE MILLION FOUR HUNDRED THIRTY FIVE THOUSAND AND 00/100 DOLLARS ($1,435,000.00).

3.   METHOD OF PAYMENT

Purchaser shall pay the Purchase Price by bank wire or certified check to PARAGON's Escrow Account, subject to collection, for Seller at the Closing. PARAGON shall in turn pay to Seller the Purchase Price minus the balance of Seller's fee due PARAGON at the time of the Closing.

4.   ALLOCATION OF THE PURCHASE PRICE

The Purchase Price shall be allocated as follows:

| | |
|---|---|
| Equipment | $ 161,400 |
| Furniture and Fixtures | $ 61,000 |
| Office and Clinical Supplies | $ 39,500 |
| Miscellaneous Assets | $ 25,100 |
| Goodwill | $ 1,076,200 |
| Goodwill Covenant | $ 71,800 |

SELLER
INITIAL 

PAGE 2

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

Purchaser and Seller each agree that they will, with respect to any state or federal tax returns, report in accordance with and be governed and bound by the allocations set forth in this Section 4.

5.    SIGNATURE DATE AND CLOSING
The date the parties initial and sign this Asset Purchase Agreement shall be referred to as the "Signature Date".

The Practice and the Assets (not including the aforementioned Excluded Assets) shall be conveyed to Purchaser (the "Closing") only upon completion of the following conditions; (i) this Asset Purchase Agreement and the attached Addenda are signed by all the parties to this Asset Purchase Agreement; and (ii) the Purchase Price is paid in full by Purchaser. The actual date the Closing is completed shall occur on or before __12 · 31 -__, 2018, as mutually agreed by the parties, and shall be referred to as the "Closing Date". Purchaser and Seller agree to the following additional covenants pending the Closing Date:

A.  For that period from the Signature Date to the Closing Date, Dr. Hulse agrees to continue to maintain the Practice's usual and customary operation, office hours and patient schedule that was in effect the year prior to the Signature Date unless prevented by his death, disability or suspension or revocation of the required license to practice dentistry.

B.  Should Seller die or become permanently disabled prior to the Closing Date so as not to be able to practice dentistry, and such disability qualifies Seller to collect permanent disability payments from a recognized insurance carrier, then Seller (or Seller's estate) may elect to accelerate the Closing and Purchaser shall be obligated to immediately assume possession of the Practice and expeditiously complete the terms of the Closing.

C.  Should at any time prior to the Closing Date, any provider/owner of Purchaser die or become permanently disabled so as not to be able to practice dentistry, and such disability qualifies such provider/owner to collect permanent disability payments from a recognized insurance carrier and/or should provider/owner's license to practice dentistry in the State of Utah be suspended or revoked, then this Asset Purchase Agreement shall automatically terminate. Should the Closing not be consummated because Purchaser is in default of this Asset Purchase Agreement and/or any of the attached Addenda, and such default is not cured as provided herein, then, at Seller's option, this Asset Purchase Agreement shall terminate.

D.  The parties agree to sign the Asset Purchase Agreement and all the attached Addenda on the Signature Date; such signed documents shall be held by PARAGON until the Closing Date, at which time each party shall complete the aforementioned terms of the Closing and the contracts shall be delivered to the parties. Should the parties fail to complete the terms of the Closing and a Closing Date does not occur, the signed contracts being held by PARAGON shall be deemed to be null and void.

E.  During the period from the Signature Date to the Closing Date, there shall not have been any material adverse change in the Practice, including any occurrence, litigation, action, or threatened action by any person or governmental agency that may materially alter the economic potential or the desirability or marketability of the Practice or the value of the Assets.

6.    DATE OF POSSESSION
Dr. Hulse shall deliver and Purchaser shall assume possession of the Practice (the "Date of Possession") on the Closing Date.

7.    INSPECTION OF ASSETS AND EXAMINATION OF TITLE
Purchaser shall inspect the Assets on or before the Signature Date. Purchaser (and/or Purchaser's attorney) prior to the Signature Date, shall complete, to the satisfaction of Purchaser, a lien search on the Practice and the Assets that includes all appropriate county and state records. Subject to

SELLER
INITIAL  

PAGE 3

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

SELLER WARRANTIES, as hereinafter described, completion of the Closing indicates the satisfactory acceptance of the Assets by Purchaser. If, following the Closing, examination of title reveals any legal defect to title that are not specifically noted and listed on the attached "ADDITIONAL PROVISIONS AND MODIFICATIONS" addendum, Dr. Hulse shall have ten (10) calendar days after written notice in which to correct such defect. If Dr. Hulse should fail to correct any such legal defect within said period, then, Dr. Hulse shall pay to Purchaser the cost to cure such default, together with all reasonable costs and expenses, including reasonable attorney's fees incurred in curing such defects, of if such defect is not curable, Dr. Hulse shall pay the cost to replace such asset, together with all reasonable costs and expenses, including reasonable attorney's fees.

8.   BILL OF SALE
Dr. Hulse shall execute and deliver to Purchaser on the Closing Date, a Bill of Sale for the Assets in the form of the "BILL OF SALE" addendum, attached hereto and made a part hereof. Dr. Hulse disclaims all implied warranties including the implied warranties of fitness for a particular purpose and merchantability of the Assets. The disclaimer of implied warranties, however, does not negate the express warranties as described herein.

9.   TAXES
Seller shall pay for any income taxes resulting from this sale. If any additional taxes, including state and/or local sales taxes, transfer and/or use taxes or documentary stamp taxes are due or become due as a result of the sale of the Assets, then all such taxes shall be paid by Purchaser as and when required. Some states and/or local taxing authorities may impose a documentary stamp tax to be paid by the lender who holds the primary lien as a result of the sale of a professional practice. Such taxes shall be paid by Purchaser from the proceeds of the loan.

10.   PRO-RATED EXPENSES
Dr. Hulse shall pay for all outstanding rents, taxes, telephone, water, sewer and other utility charges and expenses for the Practice incurred prior to the Date of Possession, regardless of when due. Purchaser shall be solely responsible for all expenses incurred on and after the Date of Possession.

A.   Any personal ad valorem, personal property taxes (if any) and any other prepaid expenses for the year in which the Date of Possession occurs shall be pro-rated between Dr. Hulse and Purchaser as of the Date of Possession. All taxes due and payable up to the Date of Possession shall be borne and paid solely by Dr. Hulse.

B.   Dr. Hulse shall compensate the current employees for all accrued salaries, vacation and sick pay, maternity leave and any other bonuses due the current employees of the Practice prior to the Date of Possession. In addition, Dr. Hulse will pay all related employment and social security taxes and insurance premiums accrued as of the Date of Possession. Purchaser shall not have any responsibility or obligation to hire any employees of the Practice. Purchaser does not assume any liability or responsibility for any compensation, benefits, bonuses or taxes due with respect to employees of the Practice.

C.   Purchaser shall be reimbursed by Dr. Hulse for any and all patient pre-paid fees paid to Dr. Hulse prior to the Date of Possession, for services to be rendered following the Date of Possession. Such reimbursement shall be paid by Dr. Hulse to Purchaser on the Date of Possession.

D.   Purchaser shall pay any expenses incurred for changing the office sign.

E.   Subject to Dr. Hulse having a usual and customary inventory of supplies on hand on the Date of Possession, the parties agree that any clinical and/or office supplies ordered for the Practice by Dr. Hulse (or his staff) prior to the Closing Date that are received after the Date of Possession shall be paid for by Purchaser, or Purchaser shall return such supplies (or any unpaid portion

SELLER
INITIAL 

PAGE 4

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

        thereof). As of the Signature Date, Dr. Hulse represents that his office has purchased but not yet received the supplies listed in the ADDITIONAL PROVISIONS AND MODIFICATIONS addendum attached hereto.

F.   Purchaser shall assume the continuing financial obligation of any Yellow Page and billboard advertising contracts in existence as of the Date of Possession.

11.   ACCOUNTS RECEIVABLE LOAN AND PURCHASER PROMISSORY NOTE

A.  The Purchase Price does not include Seller's accounts receivable, ownership of which shall remain with Seller following the Date of Possession. For purposes of this Asset Purchase Agreement, "Accounts Receivable" shall be defined as all fees due and payable to Seller (including fees for services rendered prior to the Date of Possession but not yet billed), whether private or third-party payments from public insurance, or government reimbursement for services rendered, partially and/or completed on or before the Date of Possession. Patient services waiting for pre-treatment determination by a third party shall not be considered part of the Accounts Receivable.

B.  Seller agrees to grant to Purchaser certain rights and responsibilities with respect to collection efforts for the Accounts Receivable, on the terms set forth in this Section 11(B). Also, Seller shall loan to Purchaser certain amounts actually collected with respect to the Accounts Receivable, and/or will assign to Purchaser certain uncollected Accounts Receivable, for which Purchaser shall deliver to Seller a Promissory Note, on the terms set forth in this Section 11(B):

    (i)   Estimated Statements and Listings of all Accounts Receivable as of the Closing Date and, separately, all Accounts Receivable aged 90 days or less (the "90 Day Accounts Receivable"), shall be delivered by Seller to Purchaser on the Closing Date.

    (ii)  During the period beginning on the Closing Date and ending 90 days after the Closing Date (the "Collection Period"), Purchaser shall have all collection authority with respect to all Accounts Receivable.

    (iii)  Within 10 days after the end of the Collection Period:

       1)   Purchaser will reconcile and determine the dollar amounts of the 90 Day Accounts Receivable that have been collected during the Collection Period (the "90 Day Collected Amounts");

       2)   Purchaser shall determine which, if any, Accounts Receivable that have not been collected during the Collection Period, but which Purchaser nevertheless desires to retain control over and receive ownership of from Seller (the "Over 90 Day Assigned Accounts");

       3)   Purchaser shall sign and deliver to Seller a promissory note in the form of the Accounts Receivable Promissory Note attached hereto as the "ACCOUNTS RECEIVABLE NOTE" Addendum (the "Accounts Receivable Note"). The Accounts Receivable Note shall be dated as of a date within 10 days of completion of the Collection Period. The principal amount of the Accounts Receivable Note shall equal the value of the 90 Day Collected Amounts, plus the value of any Over 90 Day Assigned Accounts. Purchaser shall pay to Seller $25,000 each month for the first 3 months after the Closing Date, which payments shall be due and payable to Seller beginning on that day which is 30 days after the Closing Date (the "Initial $75,000 Payments"). The Accounts Receivable Note shall provide for an immediate credit to Purchaser against payment thereon in the amount of the Initial $75,000 Payments, followed by 9 equal monthly payments, at which time the Accounts Receivable Note shall be paid in full; and

       4)   Purchaser shall return to Seller full control and responsibility for the collection of any and all Accounts Receivable other than those amounts reflected in the Accounts Receivable Note (the "Returned Accounts Receivable). Seller and one employee, who shall be paid by Seller, shall have access to Purchaser's office

SELLER
INITIAL 

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

and records relating to the Returned Accounts Receivable. The employee will not be a family member of Dr. Hulse. If the employee is otherwise employed by Purchaser, the employee will be limited to a maximum of five (5) hours per week for work related to the Returned Accounts Receivable.

(iv)    After the Closing Date, any payments received by Purchaser with respect to any Accounts Receivable that are aged over 90 days past due at the Closing Date (other than any Over 90 Day Assigned Accounts), shall be paid over directly to Seller within 10 days of receipt by Purchaser.

(v)     During the Collection Period, Purchaser and Seller shall share the costs of up to two employees of Purchaser who will be working to document and invoice all Accounts Receivable, including the Accounts Receivable aged over 90 days.

C.  The parties acknowledge and agree that Purchaser is not assuming liability to Seller with respect to the Acquired Accounts Receivable, other than delivery and payment to Seller of the Accounts Receivable Note. In determining allocation of patient payments against the Accounts Receivable, in contrast to payments against accounts receivable arising after the Date of Possession ("Post Date of Possession Accounts Receivable"), the following principles shall apply:

(i)     Post-Date of Possession filing of insurance in lieu of a cash payment at the time the services are rendered shall not be considered an extension of credit by Purchaser and shall be applied to the Post-Date of Possession Accounts Receivable. All third party payments received by Purchaser after the Date of Possession for services rendered prior to the Date of Possession shall be deemed payments against the Accounts Receivable. All third party payments received after the Date of Possession for services rendered after the Date of Possession, shall be deemed payments against Post Date of Possession Accounts Receivable.

(ii)    All other monies received for services rendered after the Date of Possession, if collected at the time that service is rendered, shall be applied first to that patient's Post Date of Possession Accounts Receivable; any amount paid by a patient at the time the service is rendered that is greater than the amount due for Post-Date of Possession treatment is to be applied to that patient's Accounts Receivable.

(iii)   Any pre-paid fee received by Seller prior to the Date of Possession, for services to be rendered following the Date of Possession, shall be paid over to Purchaser on the Date of Possession. Any credit balance due a patient (as defined by the State of Utah), that does not represent a pre-paid fee for services to be rendered, as of the Date of Possession shall, at the sole discretion of Purchaser, be either immediately reimbursed to the patient by Seller or paid in full to Purchaser on the Date of Possession.

(iv)    Should Purchaser extend Post-Date of Possession credit to a patient and such patient has a Pre-Date of Possession outstanding balance due Seller, then the future payments received from that patient shall first be applied to Accounts Receivable (the oldest account).

D.  Seller agrees that Purchaser will not use extraordinary methods of collection for any of the Accounts Receivable. If after the Collection Period Purchaser has returned to Seller responsibility for collection efforts with respect to certain Accounts Receivable as provided in Section 11(B)(iii)(4), then Seller shall have the right to use any legal method of collection available to Seller for such returned accounts. In all collection efforts undertaken by Seller, or on Seller's behalf, after the Collection Period, Seller agrees to clearly notify the patient that Seller is acting for Seller's own account and not by or on behalf of Purchaser.



APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

    E. The parties acknowledge and agree that Purchaser is not assuming responsibility for any liability resulting from any disputed billings involving any former patient of Seller. Seller, or Seller's designee shall have, during normal business hours and upon reasonable written notice, access to the clinical and financial records related to any Accounts Receivable.

12. **SELLER WARRANTIES**

Except where otherwise expressly stated to the contrary in this Asset Purchase Agreement or any of the attached Addenda, Dr. Hulse acknowledges that Purchaser is not assuming any liability and/or obligation (whether accrued, absolute, contingent, matured, known, unknown, or otherwise) of Dr. Hulse or the Practice or the Assets ("Seller Liabilities"). All Seller Liabilities of the Practice prior to the Closing Date (including office rent and/or equipment lease(s), if any) not expressly assumed by Purchaser hereunder shall be paid in full and discharged by Dr. Hulse on or before the Closing Date. In addition, Seller represents and warrants to Purchaser as follows as of the Signature Date and as of the Closing Date, and acknowledges and confirms that Purchaser is relying on these representations and warranties in entering into this agreement:

    A. Dr. Hulse warrants that, to the best of his actual knowledge, all financial data, federal income tax returns, schedules of Accounts Receivable, leases, certificates, schedules, practice profiles, contracts, exhibits or other instruments and/or information concerning the Practice furnished by Dr. Hulse to PARAGON and/or to Purchaser are materially true and are an accurate representation of the Practice on the dates noted in such items, and contain no income or expense not in the ordinary course of the business of the practice. Dr. Hulse specifically understands that Purchaser is relying upon the accuracy of the information and documentation provided by Dr. Hulse as a material factor for determining the Practice value and is a material inducement for Purchaser to acquire the Practice.

    B. Dr. Hulse warrants that he has investigated and independently examined, to his complete satisfaction, the personal, professional and financial background of Purchaser prior to the Closing Date, and that Dr. Hulse has not relied on, nor has PARAGON made any statements, warranties or representations, express or implied, concerning the suitability of Purchaser for this acquisition.

    C. Dr. Hulse warrants that he has been advised to independently consult with his own attorney and accountant and rely solely upon their legal, financial, tax and/or accounting advice for all issues related to this transaction.

    D. Dr. Hulse has disclosed to Purchaser any material information and/or changes that have occurred in the Practice. This includes, but is not limited to any past occurrence within a period of 36 months prior to the Signature Date, and/or any pending litigation, actions or threatened actions by any person or governmental agency that may materially alter the economic potential or the desirability or marketability of the Practice or the value of the Assets prior to the Signature Date; such previous or pending actions or changes, if any, shall be in writing and included in the attached "ADDITIONAL PROVISIONS AND MODIFICATIONS" addendum.

    E. Dr. Hulse warrants that he has disclosed to Purchaser, any known and/or diagnosed condition, including drug dependency, disease, disorder and/or disability that could affect the ability of Dr. Hulse or any other employee to operate the Practice prior to the Closing, if any.

    F. Dr. Hulse warrants that, to the best of his actual knowledge, all equipment, furniture and fixtures meet applicable state and federal regulations and shall be free from known defects, in good repair and working order (normal wear and tear excepted) as of the Closing Date unless otherwise specified on the attached "EQUIPMENT, FURNITURE AND FIXTURES" addendum.

    G. Dr. Hulse further warrants that:

SELLER
INITIAL 

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

    (i)     Hulse Dentistry , LLC and Benjamin R. Hulse, D.D.S. have the necessary authority and capacity to enter into this Asset Purchase Agreement and carry out its obligations contemplated hereby, and that this Asset Purchase Agreement constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms;

    (ii)    there are no employment contracts with any employee of the Practice that cannot be terminated at will by employer or employee and that no claim is pending or could be asserted by any current or former employee or patient of the Practice;

    (iii)   any and all third party managed care contracts that were in effect with the Practice during the last twelve (12) months (if applicable) are, to the best of Seller's actual knowledge, transferable to Purchaser and won't terminate as a result of the Closing;

    (iv)   the office is properly zoned for its intended use by Purchaser and that no lease is in default or has been in default;

    (v)    Seller is the lawful owner of the Practice and Assets and that Seller has good, valid and marketable title to the Assets, and subject to the terms of Section 1 in this Asset Purchase Agreement, the Practice and Assets will be free and clear of any liens, claims, equities, charges, options, security interests or encumbrances of any nature whatsoever with no defects of title as of the Closing Date, unless indicated to the contrary on the attached "ADDITIONAL PROVISIONS AND MODIFICATIONS" addendum (if applicable);

    (vi)   Neither Hulse Dentistry , LLC nor Benjamin R. Hulse, D.D.S. are in default under any contract, lease or any other commitment whatsoever which might affect, either directly or indirectly, Purchaser, the Assets, or the operation of the Practice;

    (vii)  no Practice-related, current or past-due obligations to creditors of Hulse Dentistry , LLC and/or Benjamin R. Hulse, D.D.S. will be outstanding as of the Closing Date and that all obligations related to the Practice will be paid in full in accordance with the terms of such obligations, unless contested in good faith;

    (viii)  there has been no work performed at the Premises which has not been paid in full or would otherwise give rise to any form of lien;

    (ix)   Seller has complied and will comply with all applicable COBRA requirements (if any);

    (x)    to the best of Seller's knowledge Seller has complied with all local, state and federal regulations (including but not limited to local, state and federal regulatory agency rules and regulations) relating to the operation of the Practice;

    (xi)   Dr. Hulse is currently licensed to practice dentistry in Utah.

    (xii)  except as set forth in the financial statements provided to PARAGON and Purchaser, Seller does not have any debts, liabilities, or obligations of any kind or character whatsoever, which relate to the Practice;

    (xiii)  in the event Seller has any bonus, deferred compensation, profit sharing, pension or retirement plan or arrangement, Seller shall be solely responsible for the termination of such retirement plans and any costs, fees or penalties incurred in connection with such termination or otherwise.

H.  Dr. Hulse warrants that the execution and delivery by Dr. Hulse of this Agreement and its attached Addenda, as well as the consummation by Dr. Hulse of the transactions contemplated thereby, do not and will not (i) violate the terms of any instrument, document or agreement of which Dr. Hulse is a party, or by which Dr. Hulse or the property of Dr. Hulse is bound, or be in conflict with, result in a breach of or constitute (upon the giving of notice, lapse of time or both) a default under any such instrument, document or agreement, or result in the creation of any lien upon any of the Assets, or (ii) violate any order, writ, injunction, decree, judgment, ruling, law, rule or regulation of any federal, state, county or foreign court or governmental authority applicable to Seller relating to the Practice.

I.  Dr. Hulse warrants that there are no taxes or present disputes as to any taxes payable by Dr. Hulse which will impair the consummation of the transactions contemplated by this Agreement, result in any lien upon the Assets, or impose on Purchaser any burden or obligation to assume

SELLER
INITIAL 

PAGE 8

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

or pay any taxes of any nature. Except for employee withholding taxes which will be deposited and /or paid according to the payment schedules required by law, to the best of Seller's knowledge and belief, all tax returns of Seller (federal, state, city or otherwise) required by law to be filed on or before the Closing Date have been duly filed in an accurate and correct manner and all corresponding taxes have been paid.

J.  Dr. Hulse warrants that to the best of his knowledge and belief, Seller is not in violation of, under any investigation with respect to, threatened to be charged with or been given notice of any non-compliance with, enforcement action under or violation of any applicable law, statute, order, rule, regulation, agency agreement, judgment, decree, arbitration award, penalty or fine entered by any federal, state, local or foreign court or governmental authority relating to the Practice or the Assets; and that there are otherwise no facts which, if known by a potential claimant or governmental authority, would give rise to a claim or proceeding to which the Practice or the Assets would be subject.

K.  Dr. Hulse warrants that there is no suit, action, arbitration, or legal, administrative, or other proceeding, or investigation, pending or, to the best of his knowledge and belief, threatened by any person or governmental agency, against or affecting the Practice, the Assets, Seller or the financial condition of Seller, nor is Seller in default with respect to any order, writ, injunction, or decree of any federal, state, local or foreign court, department, agency or instrumentality; and that there are no facts or circumstances that might lead to a claim nor has any claim been made by any third party relating to the Practice, the Assets, Seller or Seller's financial condition.

L.  No statement contained in any certificate, schedule, financial statement, .exhibit or other instrument furnished by Seller pursuant to this Asset Purchase Agreement or in any addendum hereto contains any untrue statement of fact to the best of Seller's knowledge and belief, or omits to state a fact necessary in order to make the statements contained therein not materially misleading.

13.  PURCHASER WARRANTIES
Except to the extent otherwise set forth in this Asset Purchase Agreement, Purchaser represents and warrants to Seller as follows and acknowledges and confirms that Seller is relying on these representations and warranties in entering into this Asset Purchase Agreement:

A.  That no warranties or representations, expressed or implied, concerning the Practice or Dr. Hulse have been made either orally or in writing other than as set forth in this Agreement. Purchaser further acknowledges and agrees that any Practice related income and expense projections provided to Purchaser are projections only and are not to be construed as a representation or warranty relating to the future business potential or income and expenses of the Practice, and that Seller's past results do not guarantee future performance, and that any fluctuations in post-sale income and expenses are beyond the control of Seller.

B.  That Purchaser (i) has been advised to independently consult with Purchaser's own attorney and accountant and rely solely upon their legal, tax and/or accounting advice for all issues related to this transaction, and (ii) has independently investigated and examined to Purchaser's complete satisfaction, the clinical, financial and all other records of the Practice including the number of active patients of the Practice and including third party managed care contracts, if any, and (iii) is purchasing the Practice without any statement, representation or warranty, express or implied, from Dr. Hulse other than as set forth in this Agreement.

C.  That, prior to the Closing Date, Purchaser has independently examined to Purchaser's complete satisfaction, the value of all the Assets and, except for the warranties of Dr. Hulse set forth in this Asset Purchase Agreement including those relating to the working condition and title of the Assets immediately prior to the closing, is purchasing said Assets "where and as is" on the Closing Date, solely upon the independent examination of Purchaser at that time, without any

SELLER
INITIAL 

PAGE 9

PURCHASER
INITIAL  US

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

representation or warranty, express or implied, from Dr. Hulse as to the value, condition and/or merchantability of the Assets and the Practice, other than those representations set forth by Dr. Hulse in Section 12 above. Purchaser agrees that, following the Date of Possession, Seller shall have no further responsibility or liability to Purchaser related to the condition of the Assets except for a breach of Seller's warranties of title and/or any other warranties and agreements specified in this Asset Purchase Agreement.

D.  That Purchaser (and/or Purchaser's attorney) prior to the Closing Date, has completed, to Purchaser's satisfaction, a lien search on the Practice and the Assets that includes all appropriate county and state records; however, this warranty is limited to and conditioned upon the contents and status of the applicable county and state records as of the date and time of the lien search and shall not waive the rights of Purchaser under any warranties described in this Agreement or with regard to any liens or encumbrances which arise prior to the time of Closing which may then not yet be reflected in the public records. In addition, that Purchaser has investigated to Purchaser's satisfaction that the office is properly zoned (including any variances, if applicable) for its intended use as a dental office.

E.  That Purchaser has the necessary capacity to enter into this Asset Purchase Agreement and carry out its obligations contemplated hereby, and this Asset Purchase Agreement constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms and;

   (i)   there are no actions, suits, proceedings or investigations pending or, to the best knowledge of Purchaser, threatened, in any court or before any governmental agency or instrumentality against Purchaser which if determined adversely would have a material, adverse effect on the condition, financial or otherwise, of the business, operations or affairs of Purchaser taken as a whole;

   (ii)  no statement contained in any certificate, schedule, financial statement, exhibit or other instrument furnished by Purchaser pursuant to this Asset Purchase Agreement or in any addendum hereto contains any untrue statement of fact to the best of Purchaser's knowledge and belief, or omits to state a fact necessary in order to make the statements contained therein not materially misleading;

F.  That Purchaser warrants that the execution and delivery by Purchaser of this Agreement and the documents contemplated herein, as well as the consummation by Purchaser of this acquisition, do  not and will not (i) violate the terms of any instrument, document or agreement of which Purchaser is a party, or by which Purchaser or the property of Purchaser is bound, or be in conflict with, result in a breach of or constitute (upon the giving of notice, lapse of time or both) a default under any such instrument, document or agreement, or (ii) violate any order, writ, injunction, decree, judgment, ruling, law, rule or regulation of any federal, state, county or foreign court or governmental authority applicable to Purchaser relating to the Practice.

G.  That Purchaser warrants that there are no taxes or present disputes as to taxes of any nature payable by Purchaser which will impair the consummation of the transaction contemplated by this Agreement, or result in any lien upon the Assets, and to the best of Purchaser's knowledge and belief, all tax returns of Purchaser (federal, state, city or otherwise) required by law to be filed on or before the Closing Date have been duly filed in an accurate and correct manner and all corresponding taxes have been paid.

H.  That Purchaser warrants that to the best of Purchaser's knowledge and belief, Purchaser is not in violation of, under any investigation with respect to, threatened to be charged with or been given notice of any non-compliance with, enforcement action under or violation of any applicable law, statute, order, rule, regulation, agency agreement, judgment, decree, arbitration award, penalty or fine entered by any federal, state, local or foreign court or governmental authority; and that there are otherwise no facts which, if known by a potential claimant or governmental

SELLER
INITIAL

PAGE 10

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

authority, would give rise to a claim or proceeding to which the Practice or the Assets would be subject.

l.   That Purchaser warrants that to the best of Purchaser's knowledge and belief, there is no suit, action, arbitration, or legal, administrative, or other proceeding, or governmental investigation, pending or threatened, against or affecting Purchaser or the financial condition of Purchaser, nor is Purchaser in default with respect to any order, writ, injunction, or decree of any federal, state, local or foreign court, department, agency or instrumentality; and that there are no facts or circumstances that might lead to a claim nor has any claim been made by any third party relating to Purchaser or Purchaser's financial condition.

14.   USE OF SELLER'S NAME
Purchaser shall be authorized to use Seller's name in the usual and customary operation of the Practice in an appropriate and professional manner for as long as legally and ethically permitted in Utah or for a maximum of one (1) year following the time Dr. Hulse discontinues working in the Practice. Such use of Seller's name shall not be construed as creating any association, partnership and/or joint venture between Purchaser and Dr. Hulse.

15.   ANNOUNCEMENTS
After the Closing Date, Dr. Hulse and Purchaser shall notify, in writing, all patients of the Practice whose treatment has been rendered within three (3) years prior to the Closing Date (or the head of household for families), and to all professional or other active referral sources of the Practice, by means of a mutually approved, appropriate announcement of this transaction, substantially in the form of the attached TRANSITION ANNOUNCEMENT addendum. The expense of such announcement is to be agreed upon mutually and shall be shared equally by Dr. Hulse and Purchaser. It is further acknowledged that due to the provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), any letter announcing that Dr. Hulse will be leaving the Practice shall clearly state that the Practice has been sold to Purchaser and, unless Dr. Hulse hears otherwise from the patient, the patient's records will be transferred to Purchaser.

16.   PATIENT RECORDS
Purchaser and Dr. Hulse agree to comply with all applicable regulations relating to the transferability and confidentiality of the clinical and financial content of the Patient Records. Purchaser agrees to retain the Patient Records in a safe place and manner from the Date of Possession until one (1) year beyond the expiration of all applicable statutes of limitations for liability claims.

A.   In the event of a malpractice action or claim, upon reasonable request, Purchaser will make all relevant original Patient Records available to Dr. Hulse, to the estate of Dr. Hulse, and/or any former professional employee of the Practice, in accordance with the confidentiality requirements of any applicable Federal or State law, rules and regulations. Unless otherwise determined by the courts, upon completion of such action, the original Patient Records shall be returned to Purchaser. Purchaser shall make copies of such Patient Records and maintain those copies until such time as the original Patient Records are returned.

B.   Purchaser shall first notify Seller, in writing, should Purchaser elect to discard or destroy any inactive Patient Records of any former patients of Dr. Hulse that have been retained beyond the expiration of all applicable statutes of limitations for liability claims. Dr. Hulse, within ten (10) days of such written notice, shall, at the expense of Dr. Hulse, have the right to take possession of such inactive Patient Records and shall then be responsible for their storage. Should Dr. Hulse not take possession of such records within that ten day period, then Purchaser shall have the right to dispose of such records in a manner in which confidentiality is maintained.

C.   Following the date Dr. Hulse discontinues working in the Practice, with respect to any appliance for patients treated by Dr. Hulse and held by Purchaser pending receipt of the final payment,

SELLER
INITIAL 

PAGE 11

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

such appliance shall not be disposed of by Purchaser without first notifying Dr. Hulse and the patient, in writing, 30 days in advance of disposing of any such appliance.

17. EXPENSES
Each party shall pay all their respective consultant, attorney or accountant fees and expenses incurred by such party with respect to this Asset Purchase Agreement and the transaction contemplated hereby. In the event a party hereto seeks to enforce any of its rights hereunder in a court of competent jurisdiction, and if such action results in a judgment substantially in favor of either party (a dismissal, with prejudice, by the party commencing such action, shall be deemed to be a judgment in favor of the other party for the purpose of this section), then and in such event the prevailing party shall be entitled to recover from the other party, in addition to the relief awarded the prevailing party in or by judgment, all court costs, reasonable investigation expenses, and reasonable attorneys' fees, including appellate proceedings and proceedings in bankruptcy, incurred by the prevailing party in such action. Either party failing to submit any dispute to mediation prior to arbitration or legal action, shall impose upon that party the continuing responsibility of its own attorney's fees whether or not they are ultimately determined as the prevailing party.

18. ATTORNEYS AND DOCUMENTS
The parties acknowledge their right to separate legal counsel, and agree to obtain any appropriate advice or opinion about this transaction from their respective attorneys.

A. The parties acknowledge that the documents provided to the parties by PARAGON are offered as a convenience and/or for reference purposes for each party's respective attorneys, and as a specific condition for its use the parties agree to release PARAGON, its representatives, agents and assigns, from any and all claims which they may have against PARAGON now existing, existing in the past or which may exist in the future resulting from this transaction.

B. The parties acknowledge and agree that they have been informed by PARAGON that any and all advice and/or opinion on the legality, validity, effect, tax consequences and/or other consequences pertaining to these documents or the need for any additional provisions or modifications must be provided by each party's respective attorneys.

19. INDEMNIFICATION
The parties hereby agree to defend, hold harmless and expeditiously indemnify the other party of and from any and all liability, claim, loss, damage, or expense arising out of the indemnifying party's breach or violation of any warranty or covenant contained in this Asset Purchase Agreement or its Addenda (if such breach of covenant is decided by a court of competent jurisdiction, arbitration or by admission of either party), including reasonable attorneys' fees and expert witness fees and other reasonable costs incurred in the defense of any legal proceeding asserting such a claim.

A. Dr. Hulse and/or the assigns and successors of Dr. Hulse agree to expeditiously defend, hold harmless, and indemnify Purchaser of and from any and all liability which, in any manner, arises or results from the operation of the Practice prior to the Date of Possession, and/or arising out of any conduct or practice of Dr. Hulse or Dr. Hulse's employees prior to and through the time Dr. Hulse discontinues working in the Practice, and/or from any liability or obligation of Dr. Hulse not expressly assumed by Purchaser hereunder.

B. Purchaser shall expeditiously defend, hold harmless and indemnify Dr. Hulse of and from any and all liability arising out of any conduct or practice of Purchaser and Purchaser's employees at any time following the Date of Possession, and/or from any liabilities or obligations of Dr. Hulse assumed by Purchaser and specifically described in this Asset Purchase Agreement (if any).

C. Purchaser and Dr. Hulse agree to expeditiously defend, hold harmless and indemnify PARAGON of and from any and all liability arising out of conduct of the indemnifying party and/or the indemnifying party's breach or violation of any warranty or covenant contained in this

SELLER
INITIAL 

PAGE 12

PURCHASER
INITIAL
$U\!S$

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

Asset Purchase Agreement or its Addenda (if such breach of covenant is decided by a court of competent jurisdiction, arbitration or by admission of either party), including reasonable attorneys' fees and expert witness fees and other reasonable costs incurred in the defense of any legal proceeding asserting such a claim.

D.  Upon receipt of a claim or demand for which a party is entitled to indemnification, the indemnified party shall promptly :
   (i)   notify the indemnifying party in writing of the nature of the indemnifiable claim, and the names and addresses of the persons involved in or having an interest in such claim; and
   (ii)  furnish the indemnifying party with all documents and information within the possession, custody or control of the indemnified party and relating to such claim; and
   (iii) cooperate with the indemnifying party and its counsel including but not limited to appearing as a witness as may be reasonably required and responding to all reasonable requests for documents and answering interrogatories.

E.  Upon receipt of written notice of an indemnifiable claim and all other documents and instruments required by this Asset Purchase Agreement to be furnished to the indemnifying party, the indemnifying party shall be responsible for providing a defense in a manner and utilizing attorneys selected by the indemnifying party, for which the indemnifying party shall be solely responsible for payment of all costs and expense. Indemnifying party shall not enter any negotiation or settlements with the person or entity asserting the claim without receiving the prior express written consent of the indemnified party, which may not be unreasonably withheld.

F.  In the event the indemnifying party defends the indemnifiable claim, it may do so under a reservation of its rights to cease the defense of the indemnifiable claim at a later date (upon reasonable prior written notice to the indemnified party) in the event it is determined that the indemnifying party has no obligation to defend or indemnify.

G.  Any indemnity hereunder shall be reduced by the amount of insurance proceeds received by the indemnified party on account of such matter.

H.  Notwithstanding the foregoing indemnity and hold harmless provisions of this Asset Purchase Agreement or any other provision which may provide or be deemed to provide to the contrary, none of the indemnity and hold harmless provisions hereof shall apply with respect to any actions of professional liability to the extent that such actions are insured against by either party.

I.   Should either party not fulfill the terms of indemnification as described herein, then, in addition to any other remedies provided by law, the following shall apply:
   (i)   if Purchaser does not fulfill the terms of indemnification, then Purchaser shall reimburse to Dr. Hulse all damages assessed against Dr. Hulse which, under the terms of this Asset Purchase Agreement, or otherwise, are the obligation of Purchaser, together with all reasonable costs and expenses, including reasonable attorneys' fees, actually incurred by Dr. Hulse in defending his indemnifiable position; or
   (ii)  if Dr. Hulse does not fulfill the terms of indemnification, then Dr. Hulse shall reimburse to Purchaser all damages assessed against Purchaser which, under the terms of this Asset Purchase Agreement, or otherwise, are the obligation of Dr. Hulse, together with all reasonable costs and expenses, including reasonable attorney's fees, actually incurred by Purchaser in defending Purchaser's indemnifiable position.

Should the obligation to indemnify be in dispute between the parties, then the aforementioned required reimbursement shall be required to be paid thirty (30) days following the time such dispute has been arbitrated as hereinafter provided in this Asset Purchase Agreement.

SELLER
INITIAL 

PAGE 13

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

20.   INTEGRATION
This Asset Purchase Agreement includes the Addenda attached hereto and embodies the entire agreement and understanding among and between the parties hereto and supersedes all prior agreements and understandings related to the subject matter herein. It is distinctly understood, acknowledged and mutually agreed that any default of this Asset Purchase Agreement and/or any of the Addenda attached hereto shall constitute a default of every existing agreement between the parties.

21.   CHOICE OF LAW AND VENUE
This Asset Purchase Agreement and all the Addenda shall be construed and enforced according to the laws of the State of Utah.

A.   The parties agree that any matter which may be brought or pursued in court hereunder, including arbitration, shall be brought and maintained only in the appropriate state court in the county or city where the Practice is located, and each party consents to such venue and the court's personal jurisdiction over each party.

B.   The parties acknowledge, understand and agree that PARAGON has provided this Asset Purchase Agreement for this transaction as a convenience for use by each party's respective attorney, and as a specific condition for the use of this Asset Purchase Agreement, the parties agree that any matter that involves PARAGON and any party to this Asset Purchase Agreement that may be brought or pursued in a court of law, including arbitration, shall be subject to and interpreted according to the laws of the State of Mississippi.

22.   BINDING EFFECT, ASSIGNMENT
Except to the extent of any contrary provisions herein, all of the terms of this Asset Purchase Agreement, whether so expressed or not, shall be binding upon the respective successors and assigns of the parties hereto, and shall inure to the benefit of, and shall be enforceable by the parties hereto and their respective heirs, executors, personal representatives, successors and assigns.

A.   Purchaser may assign this Asset Purchase Agreement to a professional corporation, professional limited liability company, professional association, partnership or any other entity where Purchaser is at least an equal or majority voting partner, member or shareholder. Any such permitted assignment, however, shall not relieve Purchaser of Purchaser's liabilities and obligations hereunder.

B.   Should Purchaser sell the Practice for any reason following the Closing Date, then Dr. Hulse agrees that Purchaser shall have the right to assign the warranties and covenants of Dr. Hulse contained herein (provided Purchaser is not in default of the terms of this Asset Purchase Agreement); Dr. Hulse agrees to remain bound by the terms thereof to any subsequent purchaser of the Practice, provided that said subsequent purchaser accepts the same terms and conditions affecting Dr. Hulse as outlined in this Asset Purchase Agreement.

C.   Should there be any warranties and covenants granted to Dr. Hulse by a third party who is currently, or was employed in the Practice, and/or if there are any outstanding warranties and covenants made to Dr. Hulse by any former practice owner, and such warranties and covenants relate to the Practice and are in effect at the time this Asset Purchase Agreement is signed, then, subject to the terms and conditions of those agreements with such third parties, all such outstanding warranties and covenants shall be automatically assigned to Purchaser at the Closing, to the extent that they are assignable. Dr. Hulse agrees to provide reasonable assistance to Purchaser in enforcing such outstanding warranties and covenants against such third parties for the entire term of said covenants and warranties, should such third parties breach or attempt to breach those covenants that would result in a material and adverse effect on the Practice.

SELLER
INITIAL

PAGE 14

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

23. SEVERABILITY
In the event any section or part of this Asset Purchase Agreement or any of the attached Addenda or parts thereof should be adjudged invalid, such adjudication shall in no manner affect the other sections or any addenda, which shall remain in full force and effect as if the section or addendum so declared or adjudged invalid were not originally a part hereof, unless the section or addendum so declared or adjudged invalid materially affects the consideration or obligation either party is entitled to receive or assume hereunder.

24. NOTICE AND PUBLICATIONS
Any notice or payment required or permitted in this Asset Purchase Agreement and the attached Addenda, shall be in writing and delivered personally or sent by certified U.S. Mail, return receipt requested, or via any nationally recognized overnight courier service, with all postage and other charges prepaid. Any such notice or payment from Dr. Hulse to Purchaser shall be addressed to the principal office of Purchaser. Any such notice or payment from Purchaser to Dr. Hulse shall be addressed to the last known residential address of Dr. Hulse.

A. Either party may change its address, or the designation of its representative, by notifying the other party of such change in writing.

B. Except where provided to the contrary elsewhere in this Asset Purchase Agreement and subject to the terms herein, the parties agree to give to the other party written notice of any alleged breach or violation of this Asset Purchase Agreement or the attached Addenda, or of an intention to pursue legal action against the other arising out of this Asset Purchase Agreement. The party receiving such notice shall have ten (10) days to cure such default if such default is for a late payment, and shall have thirty (30) days to cure if the default is something other than a late payment and is curable, before the other party may proceed with any legal action or exercise their right of offset against the other party.

C. This requirement of notice and time to cure shall not prohibit a party from seeking injunctive relief immediately following an alleged breach of this Asset Purchase Agreement by the other party.

D. Following the Closing, the parties agree to permit PARAGON to print and mail its usual and customary announcements of this transaction to the profession and to publish such announcements in the Utah Dental Association Journal.

25. WAIVER OF BREACH OR VIOLATION NOT DEEMED CONTINUING
Either party may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (ii) waive any inaccuracies in the representations or warranties of the other parties hereto contained herein or in any document delivered pursuant hereto and (iii) waive compliance by any of the other parties hereto with any of the agreements or conditions contained herein. The waiver by either party of a breach or violation of any provision of this Asset Purchase Agreement shall not operate as, or be construed to be, a waiver of any, or other subsequent breach or violation of any provision thereof. Acceptance of a payment or partial payment after default shall not be deemed a waiver of any preceding breach or default other than the failure of Purchaser to pay the particular part of a payment accepted, regardless of Seller's knowledge of the preceding breach at the time of acceptance. No breach or violation of any provision hereof may be waived except by an agreement in writing signed by the waiving party.

26. SURVIVAL OF SPECIFIC PROVISIONS
All covenants, warranties, obligations, indemnifications, agreements, rights and responsibilities shall survive the Closing.

SELLER
INITIAL

PAGE 15

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

27. CONSTRUCTION
All parties to this Asset Purchase Agreement acknowledge that they, with or without the assistance and/or input of their respective legal counsel, have had the opportunity to participate equally in the drafting of this Asset Purchase Agreement and that in the event of a dispute, no party shall be treated, for any purpose, as the author of this Agreement nor have any ambiguity resolved against it on account thereof.

28. NOMENCLATURE
The use of the male gender shall include the female, the individual shall include the corporate (or other such entity) (i.e. references to Dr. Hulse shall include Hulse Dentistry, LLC, and vice versa), and the singular shall include the plural, and vice versa, wherever such usage is appropriate to the context.

29. MEDIATION AND ARBITRATION
It is the intention of the parties to bring all disputes between them to an early, efficient and final resolution. Therefore, it is hereby agreed that all disputes, claims and controversies between the parties hereto, whether individual, joint in class in nature, or otherwise, shall be resolved as provided herein under the rules and auspices of American Arbitration Association ("AAA").

A. Any dispute between the parties as it relates to the terms of this Asset Purchase Agreement or any addenda attached hereto or the behavior or practice of the parties as their rights or privileges may be affected in the future, shall be submitted to formal mediation using a mediator either appointed by the AAA or a mediator who conducts his or her practice under the rules followed by the AAA or any other mediator to which the parties may agree. Mediation must commence not later than two weeks after one party notifies the agreed-upon mediator or AAA, in writing, of its request for mediation. Mediation shall be deemed to be in the nature of settlement negotiations and shall be subject to AAA Commercial Mediation Rules.

B. Any dispute not otherwise satisfactorily resolved shall be submitted to binding arbitration through AAA in Utah. Arbitration must commence not later than sixty (60) days after either party submits a written demand for arbitration to AAA, otherwise such demanding party shall be entitled to an order compelling arbitration as provided by law.
   (i)    Statutes of limitations, estoppel, waiver, laches and similar doctrines which would otherwise be applicable in any action brought by a party hereto shall be applicable in arbitration proceeding hereunder, and the parties agree that the commencement of binding arbitration proceedings hereunder shall be deemed the commencement of an action for purposes of such doctrines, whether raised in court or arbitration. Arbitration is commenced on the date a notice of demand for binding arbitration is received by AAA.
   (ii)   Arbitration shall be conducted by a single arbitrator appointed by AAA. Arbitration proceedings shall be conducted in accordance with AAA Arbitration Procedures unless otherwise agreed between the parties. The arbitrator shall have the power to award monetary and/or non-monetary relief but shall not have the power to award punitive damages.
   (iii)  The decision by the arbitrator shall be final and binding upon the parties and/or their heirs, successors and assigns. Judgment upon the award rendered may be entered in any court for confirmation of the award and the entry of a judgment or for any other relief with respect to the award as provided by law.

C. During mediation and arbitration proceedings, the parties shall continue performance of this Asset Purchase Agreement unless doing so would unnecessarily increase damages. The parties agree to adhere to all covenants (as described herein) until such time as the arbitration process has been completed and the arbitrator has determined each party's post-arbitration obligations and responsibilities as they relate to such warranties and covenants.

SELLER
INITIAL 

PAGE 16

PURCHASER
INITIAL
MS

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

    D. The fees and costs of mediation shall be divided equally between the parties. The fees and costs of arbitration, including without limitation, arbitration fees, reasonable attorneys' and accountants' fees, witness expenses and other related expenses actually incurred, shall be awarded by the arbitrator.

    E. The requirement of arbitration shall not prohibit a party from seeking injunctive relief from a court of competent jurisdiction immediately following an alleged breach of this Asset Purchase Agreement by the other party.

    F. The parties may elect to use a mediation and arbitration service comparable to the AAA if mutually agreed to by all the parties to this Agreement.

30. ITEM HEADINGS AND INTERPRETATION
The table of contents and item headings contained in this Asset Purchase Agreement are for convenience only and shall in no manner be construed as a part of this Asset Purchase Agreement. Whenever the words "include", "includes" or "including" are used in this Asset Purchase Agreement, they shall be deemed to be followed by the words "without limitation". In addition, any other information, including articles and summaries prepared by PARAGON, Inc., shall not affect in any way the meaning or interpretation of the text of this Asset Purchase Agreement.

31. PERSONAL GUARANTY OF SELLER
Dr. Hulse acknowledges and agrees that he has read this Asset Purchase Agreement and the attached Addenda in their entirety and that he understands and agrees to be bound by the terms and conditions as stated therein. Dr. Hulse expressly waives the right to protest the reasonableness of, and individually and personally guarantees the performance of the respective obligations, warranties and covenants contained in this Asset Purchase Agreement and the attached Addenda, whether corporate (or other such entity) or individual.

32. PERSONAL GUARANTY OF PURCHASER
The owners of Swan Pediatric Dental, P.C. personally guarantee the performance of Swan Pediatric Dental, P.C. as set forth in the attached "UNCONDITIONAL GUARANTY" addendum.

33. OTHER PROVISIONS OR MODIFICATIONS
Other provisions or modifications of this Asset Purchase Agreement, if any, are set forth in the attached "ADDITIONAL PROVISIONS AND MODIFICATIONS" addendum.

SELLER
INITIAL

PAGE 17

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

IN WITNESS WHEREOF, each party has executed this Asset Purchase Agreement and the attached Addenda on the aforementioned Signature Date.

**THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.**

_____
Witness

_____
Witness

_____
Witness

Seller:
Hulse Dentistry , LLC

by _____
Benjamin R. Hulse, D.D.S.

Title: _____

Seller:

_____
Benjamin R. Hulse, D.D.S.

Purchaser:
Swan Pediatric Dental, P.C.

by _____
Matthew A. Swan, D.D.S.
Title: President and CEO



APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

# ADDENDUM

Attached to and made a part of that certain Asset Purchase Agreement by and between Hulse Dentistry , LLC and Benjamin R. Hulse, D.D.S. and Swan Pediatric Dental, P.C.

## EQUIPMENT, FURNITURE AND FIXTURES

### Reception Area – Salem
(13) Waiting Room Chairs
(1) Table
(2) Lamps
(2) TV's

### Business Office – Salem
(6) Computers
(3) Printers
(1) Fax Machine
(4) File Cabinets
(4) Telephones

### Private Office – Salem
(2) Computers
(1) Printer
(1) Scanner
(1) Telephone

### Staff Lounge – Salem and Nephi
(Each location has the following)
(1) Computer
(1) Projector/Screen (Salem only)
(6) Cabinets
(1) Water Cooler
(1) Fridge
(1) Table and Chairs

### X-Ray Equipment – Salem
(1) Pan/Ceph/Cone Beam
(3) Nomads
(3) Sensors

### X-Ray Equipment – Nephi
(2) Nomads
(2) Sensors
(1) Pan

### Tanks – Salem and Nephi
(Each location has the following)
(4) Nitrous Tanks
(1) Manifold

### Sterilization/Lab – Salem and Nephi
(Each location has the following)
(2) Autoclaves
(1) Ultrasonic
(1) Model Trimmer
(1) Vibrator
(1) Lab Drill
(1) Suck down Unit
(1) Trimmer

### Lab – Salem and Nephi
(Each location has the following)
(1) Lathe
(1) Electric Handpiece Cleaner

### Mechanical
(Each location has the following)
(1) Compressor
(1) Multi Switch Lab
(1) Suction/Vacuum          .

### Room #1-8 Salem and Room #1-5 Nephi
### (Each room – 13 total – has the following)
(1) Computer
(1) Patient Chair
(1) Doctor's Chair
(1) Assistant Stool
(1) Curing Light
(1) Nitrous Flow Meter
(1) Amalgamator
(1) Patient View Screen
    (Excluding Salem Rooms 7 & 8)
(1) Guest Chair

### Kids Bay – Salem
(3) Computers
(3) Patient Chairs
(3) Doctor's Chairs
(2) Guest Chairs
(3) TV's
(2) Nitrous Controls

### Kids Bay – Nephi
(3) Computers
(3) Patient Chairs
(3) Doctor's Chairs
(3) TV's

SELLER
INITIAL 

PAGE 19

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

# ADDENDUM

Attached to and made a part of that certain Asset Purchase Agreement by and between Hulse Dentistry , LLC and Benjamin R. Hulse, D.D.S. and Swan Pediatric Dental, P.C.

## ITEMS EXCLUDED FROM SALE

In addition to the items specifically excluded in Section 1 of the Asset Purchase Agreement, the following items are also to be excluded from this sale:

      (1)  Camera located in doctor's office

SELLER
INITIAL 

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

# ADDENDUM

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS, THAT Hulse Dentistry , LLC and Benjamin R. Hulse, D.D.S., (jointly and severally hereinafter called "Seller"), for good and valuable consideration, in hand paid at and before the sealing and delivery of these presents, the receipt and adequacy of which is hereby acknowledged, does hereby sell, set over, transfer, assign and convey unto Swan Pediatric Dental, P.C., (hereinafter called "Purchaser") and any successors or assigns, all Seller's right, title and interest in and to the Assets (as described in the attached Asset Purchase Agreement dated _December 31,_ 2018 between Seller and Purchaser) subject to the terms and conditions, warranties and covenants described in the Asset Purchase Agreement and all Addenda attached thereto, whether such interest is joint or several, individual or corporate (or other such entity).

And for the same consideration, Seller, and Seller's successors and assigns, covenant with and warrant unto Purchaser and Purchaser's successors and assigns, that Seller is the lawful owner of the property hereby conveyed, that Seller has good and marketable title to Seller's interest in said property, and, to the extent described in the Asset Purchase Agreement, that said property is free and clear of any liens and encumbrances of any kind, character or nature, and that Seller, and Seller's successors, heirs and assigns, will forever warrant and defend the same unto Purchaser and Purchaser's successors, heirs and assigns, against all lawful claims and demands whatsoever. Successors and assigns include heirs, executors, administrators and personal representatives.

IN WITNESS WHEREOF, Seller has executed and delivered this Bill of Sale, effective the Closing Date described in the aforementioned Asset Purchase Agreement.

Witness

Witness

Seller:
Hulse Dentistry , LLC

by
Benjamin R. Hulse, D.D.S.

Seller:

Benjamin R. Hulse, D.D.S.

SELLER
INITIAL

PAGE 21

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

# ADDENDUM

## RESTRICTIVE COVENANT AGREEMENT

THIS RESTRICTIVE COVENANT AGREEMENT (the "Restrictive Covenant Agreement") is entered into by and between Benjamin R. Hulse, D.D.S. (hereinafter referred to as "Dr. Hulse" and/or "Covenantor"), and Swan Pediatric Dental, P.C. (hereinafter referred to as "Purchaser").

WHEREAS, Purchaser and Covenantor have simultaneously executed the attached Asset Purchase Agreement dated  December 31 , 2018 (the "Asset Purchase Agreement") through which Purchaser has acquired a general dentistry practice (the "Practice") located at 601 N State Rd #198, Salem, UT  84653 and 54 N Main St., Nephi UT 84648; and

WHEREAS, Covenantor, as an incentive and as a specific condition for Purchaser to acquire the goodwill of the Practice (as defined in the Asset Purchase Agreement), makes, gives and agrees to these covenants respecting competition and solicitation, all ancillary to the sale of the Practice, in favor of Purchaser.

NOW, THEREFORE, in consideration of the premises as well as the parties' respective promises, representations, covenants and warranties, the performance of each unto the other, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   GOODWILL COVENANT
     In consideration of and in conjunction with the sale of the Practice and to assure Purchaser of the beneficial enjoyment of the aforementioned goodwill, Dr. Hulse hereby grants the following restrictive covenant (the "Goodwill Covenant").

     A.  Dr. Hulse hereby individually covenants and agrees not to practice dentistry, in any location, as a private practitioner, partner, associate, employee or as an owner, officer, or director of any corporation or organization so engaged, or lend his name to any business organization competitive with the Practice, within a radius of twenty-five (25) miles from each of the hereinafter defined Premises (the "Restricted Area") for a period of five (5) years from the Closing Date (as defined in the Asset Purchase Agreement) (the "Restricted Period"). This provision shall not prevent Dr. Hulse from continuing to practice in the Practice from the Closing Date to the Date of Possession (as defined in the Asset Purchase Agreement); provided, however, that unless the parties agree otherwise (as provided in the Asset Purchase Agreement), the Closing Date shall be the same as the Date of Possession.

     B.  For the purpose of this Restrictive Covenant Agreement, the "Premises" shall be 601 N State Rd #198, Salem, UT  84653 and 54 N Main St., Nephi UT 84648.

     C.  To "practice dentistry" shall not include any government sponsored public health or other institutional practice that is limited to treatment of non-private patients and/or any non-clinical academic position in any dental related teaching institution.

     D.  If a court should hold that the Restricted Period and/or the Restricted Area is unreasonable, then to the extent permitted by law the court may prescribe a duration for the Restricted Period and/or a radius or area for the Restricted Area that is reasonable and the parties agree to accept such determination subject to their rights of appeal. Nothing herein stated shall be construed as prohibiting Purchaser from pursuing any other equitable remedy or remedies available for such breach or threatened breach, including recovery of damages from Dr. Hulse or injunctive relief.

SELLER
INITIAL

PAGE 22

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

E. This Restrictive Covenant Agreement shall be considered a personal service agreement between Dr. Hulse and Purchaser. Should Dr. Hulse be in violation of this Restrictive Covenant Agreement then the Restricted Period shall be extended for a period of time equal to the period during which said violation or violations occurred. If Purchaser seeks injunctive relief from said violation in court, then the running of the Restrictive Period shall be suspended during the pendency of said proceeding, including all appeals by Dr. Hulse. This suspension shall cease upon the entry of a final judgment in the matter.

F. Dr. Hulse agrees not to discuss any Practice related policies and/or issues that may be considered a breach of professional standards by Purchaser with the staff, patients, and/or referral sources of the Practice, either before, during or following the Restricted Period. Dr. Hulse agrees that any differences that may arise relating to such policies and/or issues will be discussed only with Purchaser, or if necessary, with Purchaser's legal representative.

2. NON-SOLICITATION

As a further inducement to Purchaser to acquire the Practice, Dr. Hulse hereby warrants and agrees that Dr. Hulse, and/or any agent of Dr. Hulse, during the Restricted Period, will not solicit any of his former patients of the Practice (those who have received treatment at any time during the 36 month period immediately preceding the Restricted Period). In addition:

A. During the Restricted Period, Dr. Hulse agrees not to solicit any professional referral sources of the Practice, for any business that could otherwise be referred to Purchaser.

B. During the Restricted Period, Dr. Hulse agrees not to recommend to any patients of the Practice to patronize any other practitioner in the same specialty other than Purchaser and, if asked by a patient of the Practice, to affirmatively recommend the services of Purchaser, regardless of the distance of that patient's domicile from the Premises.

C. During the Restricted Period, Dr. Hulse agrees not to solicit, employ or contract with any of the employees of the Practice who were employed by Purchaser during the Restricted Period, to work for anyone other than Purchaser.

D. If Dr. Hulse will continue to practice dentistry in another location other than the Premises (if applicable), then his immediate family members (limited to grandparents, parents, siblings and children of both Seller and Seller's spouse) shall not be included in this non-solicitation.

3. LIQUIDATED DAMAGES

Dr. Hulse acknowledges that any breach of the terms of this Restrictive Covenant Agreement will result in irreparable and continuing damage to Purchaser for which there will be no adequate remedy by law. Therefore, in addition to any other remedies available hereunder and/or at law or in equity:

A. The parties agree that any intentional, material breach by Dr. Hulse of this Restrictive Covenant Agreement shall result in, as liquidated damages, the immediate release of Purchaser from any and all liabilities owed to Dr. Hulse resulting from this Asset Purchase Agreement and its Addenda including, but not limited to, all liens granted to Dr. Hulse pursuant thereto and Dr. Hulse shall be required to immediately pay to Purchaser an amount equal to eighty percent (80%) of the Purchase Price (as described in the Asset Purchase Agreement) as liquidated damages.

B. Any such material breach of this Restrictive Covenant Agreement, intentional or otherwise, if in dispute by the parties, shall be determined by arbitration as provided in the attached Asset Purchase Agreement.

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

4.   WAIVER OF RIGHT TO PROTEST
     The restrictive covenants contained herein are ancillary to a sale of the Practice and are to be construed as cumulative with those set forth in any other agreements between the parties hereto. Dr. Hulse expressly agrees that the duration, geographical limitations and description of the prohibited conduct described in this Restrictive Covenant Agreement are reasonable and that Dr. Hulse has received valuable consideration for the warranties and covenants contained herein. Dr. Hulse further expressly waives the right to protest the reasonableness of the limitations, warranties, geographical limitations and prohibited conduct specified in this Restrictive Covenant Agreement.

5.   SPECIFIC PERFORMANCE
     Any breach of the warranties, agreements and covenants contained herein shall be subject to specific performance by temporary as well as permanent injunction or other equitable remedies by a court of competent jurisdiction, and which injunctions may be sought prior to resorting to arbitration of any such breach. The obtaining of any such injunction shall not prevent the obtaining party from also seeking and obtaining any damages incurred as a result of such breach, either prior to or after obtaining such injunction. If any court of competent jurisdiction determines that either party has breached any of the foregoing covenants, then that party shall pay all reasonable costs of enforcement of the foregoing covenants including, but not limited to, court costs and reasonable attorneys' fees, including such costs and fees through any appeals.

IN WITNESS WHEREOF, Covenantor has executed this Restrictive Covenant Agreement effective as of the Closing Date (as defined in the Asset Purchase Agreement).

Witness

Covenantor:

_____
Benjamin R. Hulse, D.D.S.

Witness

Purchaser:
Swan Pediatric Dental, P.C.

by _____
Matthew A. Swan, D.D.S.
Title: President and CEO

SELLER
INITIAL 

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

# ADDENDUM

## ACCOUNTS RECEIVABLE PROMISSORY NOTE

Date:    [_____], 2019  [Note to draft:  to be dated within 10 days after the Collection Period, as defined in Section 11(b)(ii) of the APA; all bracketed material to be completed or deleted (as applicable) from final version of the Note]

$ [_____] (herein, the "**Note Principal Amount**") [Note to draft:  insert here the sum of the 90 Day Collected Amounts, and the Over 90 Day Assigned Accounts (as those terms are defined in Section 11(b)(iii) of the APA)]

1. Pursuant to Section 11 of the Asset Purchase Agreement between Benjamin R. Hulse, DDS and Hulse Dentistry, LLC, as Sellers, and Swan Pediatric Dental, PC, as Purchaser (herein, the "**APA**"), and as consideration for the benefits described in Section 2 herein, the undersigned, Swan Pediatric Dental, P.C. (the "**Maker**"), promises to pay to the order of Benjamin R. Hulse, D.D.S. and Hulse Dentistry, LLC (together, the "**Payee**"), the principal sum of [_____] ($[_____]), [Note to draft: insert the Note Principal Amount here] without interest, pursuant to the terms set forth herein.

2. Pursuant to Section 11 of the APA, Payee has loaned to Maker the 90 Day Collected Amounts, and Payee has assigned to Maker the Over 90 Day Assigned Accounts, as those terms are defined in Section 11(b)(iii) of the APA.  In addition to the Purchase Price under the APA, Maker has also paid to Seller $25,000 each month for the first 3 months after the Closing Date of the APA (the "**Initial $75,000 Payments**").

3. As of the date hereof, the Note Principal Amount shall be credited with Maker's payment of the Initial $75,000 Payments.

4. Maker shall pay to Payee the balance of the Note Principal Amount (the Note Principal Amount minus the Initial $75,000 Payments) in nine (9) equal, consecutive, monthly payments in the amount of $[_____] each, commencing thirty (30) days from the date of this Note and continuing on the same day of each consecutive month thereafter until the entire Note Principal Amount is paid in full.

5. All payments and other amounts due hereunder from Maker to Payee shall be in good, and immediately available, lawful money of the United States.

6. Maker may prepay the Note Principal Amount in whole or in part at any time without penalty or premium.  Any partial prepayment of the Note Principal Amount shall be applied against the Note Principal Amount outstanding, and shall not postpone the due date of any subsequent monthly installments or change the amount of such installments, unless otherwise agreed in writing by Payee.

7. The Note Principal Amount is payable at the address of the Payee, or such other addresses as may be designated by the Payee from time to time.

8. Should any payment not be paid when due or within ten (10) days thereafter, and remains unpaid for a period of ten (10) days or more after written notice of such default from the Payee, then the entire unpaid Note Principal Amount shall, at the option of the Payee and without further notice to the undersigned, become due and may be collected forthwith.

9. Neither failure nor delay in accelerating the maturity of the indebtedness evidenced hereby or in otherwise exercising any rights of Payee hereunder, nor the acceptance by Payee of installment

SELLER
INITIAL 

PAGE 25

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

payments made hereunder after Maker's default, shall be deemed a waiver of such right or default unless such waiver be in writing and signed by Payee.

10. If this Note is collected by or through an attorney or order of a court of competent jurisdiction, all costs of collection, including but not limited to court costs and reasonable attorney's fees, shall be paid by Maker.

11. This Note is to be construed in all respects and enforced according to the laws of the State of Utah. Time is of the essence of this Note.

12. The Maker hereby waives and renounces any and all exemption rights Maker may have under or by virtue of the constitution or laws of the State of Utah as against this debt or any renewal thereof; Maker further waives presentment of payment, demand, protest, and notice of dishonor and demand, protest and non-payment.

**13. THIS INSTRUMENT IS SUBJECT TO A SUBORDINATION AGREEMENT DATED AS OF _____, BETWEEN _____ AND LENDEAVOR, INC., ITS SUCCESSORS AND ASSIGNS. BY ITS ACCEPTANCE OF THIS INSTRUMENT, THE HOLDER HEREOF AGREES TO BE BOUND BY THE PROVISIONS OF SUCH SUBORDINATION AGREEMENT TO THE SAME EXTENT THAT SUBORDINATED CREDITOR (AS DEFINED THEREIN) IS BOUND.**

IN WITNESS WHEREOF, the Maker has executed this Promissory Note, and Payee agrees to such terms, as of the above written date.

Maker:
Swan Pediatric Dental, P.C.

Witness

by _____
Matthew A. Swan, D.D.S.
Title: President and CEO

Witness

Payee:
Hulse Dentistry, LLC

by _____
Benjamin R. Hulse, D.D.S.

Title: _____

Witness

Payee:

Benjamin R. Hulse, D.D.S.

SELLER
INITIAL

PAGE 26

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

# TABLE OF PAYMENTS AND CREDITS

| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
|  | Beginning balance |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

SELLER
INITIAL

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |

SELLER
INITIAL 

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |

SELLER
INITIAL 

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |
|      |             |        |         |

SELLER
INITIAL 

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

# ADDENDUM

## PROFESSIONAL OFFICE LEASE AGREEMENT
## SALEM OFFICE

THIS LEASE, dated _December 19th_____, 2018 (the "Lease"), by and between Benjamin R. Hulse, D.D.S. (hereinafter referred to as the "Landlord"); and Swan Pediatric Dental, P.C., (hereinafter referred to as the "Tenant");

## WITNESSETH:

1.  PREMISES
    Landlord, for and in consideration of the rents, covenants, agreements, and stipulations hereinafter mentioned, reserved, and contained, to be paid, kept, and performed by Tenant, has leased and rented, and by these presents does lease and rent, unto Tenant, and Tenant hereby agrees to lease and take upon the terms and conditions which hereinafter appear, an office space (consisting of approximately _____ rentable square feet) located at 601 N State Rd #198, Salem, UT 84653 (which shall, for purposes of this Lease, hereinafter be referred to as the "Leased Premises").

2.  TERM
    To have and to hold the Leased Premises for a term of five (5) years, beginning _December 31, 2018_ (the "Effective Date") and ending _December 3 2024_ the "Original Term") at midnight, unless terminated sooner as hereinafter provided.

3.  RENTAL AND SECURITY
    Tenant agrees to pay to Landlord, at Landlord's principal place of business, promptly on the first day of each month, in advance, during the first year of the Original Term, a monthly rental of $5,500.00 plus applicable sales tax (if any). The monthly rental for each subsequent year shall increase by $150.00 (i.e. the monthly rental during year two shall be $5,650.00 plus applicable sales tax (if any), and so forth).

    A.  Tenant shall pay, as additional rental, an amount equal to five percent (5%) of one month's rent as a late penalty payment should Landlord not receive the monthly rental payment within fifteen (15) days after the due date.

    B.  In the event of a bona fide sale of the Leased Premises made expressly subject to this lease, Landlord shall have the right to transfer the security to the purchaser to be held under the terms of this lease.

4.  UTILITY BILLS AND AD VALOREM TAXES

    A.  Tenant shall pay all utility bills, including, but not limited to water, sewer, gas, electricity, fuel, garbage collection and other sanitary services provided to the Leased Premises. If Tenant fails to pay any of said utility bills, Landlord may pay the same and such payment may be added to the rental of the Leased Premises next due as additional rental.

    B.  Tenant shall pay all personal property ad valorem taxes (non-real estate only) due resulting from the occupancy of the Leased Premises by Tenant and. Tenant agrees to hold harmless and indemnify Landlord against any liability on such account. Tenant shall pay all common area maintenance fees and/or condominium association fees, if applicable

SELLER
INITIAL 

PAGE 31

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

5.   USE OF PREMISES
The Leased Premises shall be used for a professional office space and no other, without the prior written consent of Landlord, which consent shall not be unreasonably withheld. The Leased Premises shall not be used for any illegal purposes, nor in any manner to create any nuisance or trespass nor vitiate the property insurance or increase its rate.

6.   ABANDONMENT OF LEASED PREMISES
Tenant agrees not to abandon or vacate the Leased Premises during the period of this lease. Unless otherwise provided to the contrary herein, no termination of this lease prior to the normal ending thereof, by lapse of time or otherwise, shall affect Landlord's right to collect rent for the period prior to termination thereof.

7.   REPAIRS BY LANDLORD AND LANDLORD EXPENSES
Except for repair expenses rendered necessary by the negligence of Tenant, its agents, employees, or invitees, Landlord agrees to promptly repair and keep in good working order the roof, foundations, and the exterior walls of the Leased Premises (exclusive of all glass and exterior doors), underground utility and sewer pipes outside the exterior walls of the building (including those running under the parking lot), the heating and air conditioning units, water heater and any fire protection and sprinkler systems, sidewalks and parking lot.

   A.   Landlord gives to Tenant exclusive control of the Leased Premises and shall be under no obligation to inspect said Leased Premises.

   B.   Tenant shall promptly notify Landlord, in writing, of any known defective condition that Landlord is required to repair, and failure to so report such known defects shall make Tenant responsible to Landlord for any increased liability incurred by Landlord by reason of such failure to report the defective condition. Any such repairs or alterations by Landlord shall be accomplished promptly and in a good and workmanlike manner. All such work shall be completed in such a manner that shall minimize or avoid interference with Tenants use of the Leased Premises.

   C.   If Landlord fails to make such repairs or replacements, then Tenant shall have the right to make such repairs or replacements; Tenant may deduct or retain any reasonable amount so paid out of any rents, provided however, that Tenant shall supply Landlord with an accounting for all such expenses before deducting the same from the rent.

8.   REPAIRS BY TENANT AND TENANT EXPENSES
Tenant accepts the Leased Premises in its present condition and as suited for the uses intended by Tenant. Landlord is not aware of any defects in or about the Leased Premises as of the Signature Date. Tenant shall, throughout the initial term of this lease and all renewals thereof, at Tenant's expense, maintain the Leased Premises in good order and repair, including the building and other improvements located thereon, except those repairs expressly required to be made by Landlord. Tenant shall be responsible for glass breakage and sign damage unless caused by the negligence or intentional acts of Landlord and/or its agents.

   A.   If Tenant occupies the entire building and is the sole tenant, then Tenant further agrees to care for the grounds around the building, including the mowing of grass and care of shrubs and shall maintain the sidewalks and parking lot free from dirt, snow, ice, rubbish and other obstructions or encumbrances.

   B.   Tenant agrees to return said Leased Premises to Landlord at the expiration or the termination of this lease in as good condition and repair as when first received, natural wear and tear, damage by storm, fire, lightning, earthquake, or other casualty alone excepted.

   C.   Other than the customary materials typically found in dental practices, Tenant shall not, without Landlord's prior written consent, keep on the Leased Premises any substances designated as,

SELLER
INITIAL 

PAGE 32

PURCHASER
INITIAL
_MS_

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

or containing components designated as, hazardous, dangerous, toxic or harmful (collectively "hazardous substances"). With respect to any hazardous substances, Tenant agrees to comply with all applicable codes, rules and regulations regarding the handling and disposal of such hazardous substances. Tenant agrees to indemnify Landlord from and against any and all damages, costs or expenses, including the expense of clean-up, disposal, inspection, and/or fines imposed as a result of any hazardous substances introduced on the Leased Premises during this tenancy.

D. Tenant may not make changes to the interior or exterior of the Leased Premises without the written consent of Landlord. Notwithstanding the foregoing, painting or other minor improvements may be made without prior approval.

9.  PROPERTY TAXES AND INSURANCE
Landlord shall pay all real estate taxes for the Leased Premises and shall provide and pay for the building property and general liability insurance coverage for the office building. Tenant shall pay upon demand, as additional rental during the term of this lease and any extension or renewal thereof, any increases in all insurance and taxes (and any other governmental charges to the Leased Premises) over the amount charged the first full calendar year this lease is in effect.

A. In the event the Leased Premises are less than the entire property assessed, then the amount due by Tenant for any such increases called for by the above paragraph shall be determined by proration on the basis of the rentable floor area of the Leased Premises bears to the rentable floor area of the entire property assessed. Tenant's pro rata portion, as provided therein, shall be payable within fifteen (15) days after receipt of notice from Landlord as to the amount due.

B. Landlord shall submit to Tenant a copy of the actual statements received from any present and future taxing authority as they become due. Landlord shall also submit to Tenant a copy of the insurance statement relating to the Leased Premises.

10. DESTRUCTION OR DAMAGE TO THE PREMISES
If the Leased Premises are totally destroyed by storm, fire, lightning, earthquake, or other casualty, then this lease shall terminate as of the date of such destruction and rental shall be accounted for as between Landlord and Tenant as of that date.

A. If the Leased Premises are damaged but not wholly destroyed, and the Leased Premises may be safely used for providing dental services, then rental shall abate in such proportion as use of the Leased Premises has been destroyed and Landlord shall, without delay, promptly restore the Leased Premises to substantially the same condition as before such damage, whereupon full rental shall recommence.

B. Subject to any responsibility of Landlord to provide any building property or general liability insurance pursuant to Section 9 above, Landlord shall not be responsible or liable to Tenant for any loss or damage that may be occasioned by or through the acts or omissions of persons occupying adjoining property or any part of the building of which the Leased Premises are a part, or for any loss or damage resulting to Tenant or Tenant's property from bursting, stoppage or leaking of water, gas, sewer or steam pipes.

11. INDEMNITY
Tenant agrees to hold harmless and indemnify Landlord against all claims for damages to persons or property attributable to Tenant's occupancy of the Leased Premises or use thereof authorized by Tenant, and all expenses incurred by Landlord as a result thereof including reasonable attorneys' fees and court costs, unless caused by the negligence or intentional acts of Landlord and/or its agents or representative.

SELLER
INITIAL 

PAGE 33

PURCHASER
INITIAL
MS

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

A. Tenant shall at Tenants expense, during the entire term of this lease, maintain in full force and effect, a general liability insurance policy for public liability and property damage with respect to the Leased Premises and the business operated by Tenant. Such insurance shall include bodily injury in sums of not less than $500,000 per person and $1,000,000 per occurrence, and property damage losses of not less than $50,000. Such policy shall cover office contents and shall include plate glass coverage for all windows and glass doors located on the Leased Premises. Landlord shall be named as an additional insured on any such policy, to the extent permitted by the insurance carrier.

B. Tenant shall at all times provide Landlord with confirmation that such insurance is in full force and effect. Upon Tenant's failure to provide such insurance, Landlord may, at Landlord's option, obtain such insurance and the cost thereof shall be paid as additional rent due and payable upon the next ensuing rent day.

C. Subject to any responsibility of Landlord to provide any building property or general liability insurance pursuant to Section 9 above, Landlord shall not be liable for any loss or damage to the Leased Premises resulting from fire or other perils due to any cause whatsoever except negligent damage by the Landlord or Landlord's agents, whether or not such insurance is in effect on the Leased Premises.

12. GOVERNMENTAL ORDERS
Tenant agrees, at Tenant's own expense, to promptly comply with all requirements of any legally constituted public authority made necessary by reason of Tenant's occupancy of said Leased Premises. Landlord agrees to promptly comply with any such requirements if not made necessary by reason of Tenant's occupancy.

13. CONDEMNATION
If the Leased Premises, or any portion thereof should be condemned by any legally constituted authority for any purpose, then the term of this lease shall cease from the date when possession thereof is taken, and rental shall be accounted for as between Landlord and Tenant as of said date. Such termination, however, shall be without prejudice to the rights of either Landlord or Tenant, to the extent of their respective interest, to recover compensation and damage caused by condemnation from the condemnor. Neither party shall have any rights in any award made to the other by any condemnation authority, notwithstanding termination of this lease.

14. ASSIGNMENT AND SUBLETTING
Tenant may assign this lease or sublease all or portions of the Leased Premises to others if such operation is within the purposes for which the Leased Premises may be used; provided however, that such assignment or sublease shall require the prior written consent of Landlord, which shall not be unreasonably withheld.

A. Consent to any assignment or sublease shall not destroy this restrictive provision, and all later assignments or subleases shall be made likewise only on the prior written consent of Landlord.

B. Assignee of Tenant, at option of Landlord, shall become directly liable to Landlord for all obligations of Tenant hereunder, but no sublease or assignment by Tenant shall relieve Tenant of any liabilities hereunder. If any subtenant of Tenant should fail to surrender possession of the Leased Premises by the end of the term of this lease, such failure shall not constitute a "holding over" by Tenant so as to impose any liability on Tenant.

15. REMOVAL OF EQUIPMENT AND TRADE FIXTURES
Tenant may (if not in material default of this lease) within thirty (30) days prior to the expiration of this lease, or any extension thereof, remove all removable, non-permanent trade fixtures, such as equipment and modular cabinetry installed by Tenant, provided Tenant repairs all damage to Leased Premises caused by such removal. All leasehold improvements including plumbing, electrical and

SELLER
INITIAL 

PURCHASER
INITIAL
MS

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

carpentry improvements, built-in cabinetry and sinks, and any other property not removed by Tenant at the termination of this lease shall become the property of Landlord.

16.   SECURITY INTEREST

As security for the payment of rent and other charges becoming due hereunder, Tenant hereby grants to Landlord a security interest in all the inventory and equipment on the Leased Premises during the term of this lease; such security interest, however, shall be subordinate to Tenant's bank financing required for the acquisition of the Practice (as described in the attached Asset Purchase Agreement), if required by that bank. The Landlord agrees to execute an agreement whereby Landlord will subordinate Landlord's lien or liens, statutory or otherwise, arising out of this lease, to enable Tenant to obtain financing for additional or replacement equipment, if required to do so by a lender.

17.   CANCELLATION OF LEASE BY LANDLORD

A.   It is mutually agreed that in the event:

   (i)    Tenant shall default in the payment of rent, including additional rent, therein reserved, when due, and fails to cure the default within ten (10) days after written notice thereof from Landlord; or

   (ii)   Tenant shall be in material default in performing any of the terms or provisions of this lease other than the provisions requiring the payment of rent, and fails to cure such default within thirty (30) days after the date of receipt of written notice of default from Landlord; or

   (iii)  if Tenant's effects should be levied upon or attached under process against Tenant and not satisfied or dissolved within thirty (30) days after written notice from Landlord to Tenant to obtain satisfaction thereof; then,

in any of said events, Landlord, at Landlord's option, may at once, or within six (6) months thereafter (but only during continuance of such default or condition) terminate this lease by written notice to Tenant, whereupon this lease shall end; upon such default, the remainder of all rental payments due under the term of this lease shall accelerate and become immediately due and payable to Landlord.

B.   After an authorized assignment or subletting of the entire Leased Premises covered by this lease, the occurring of any of the foregoing defaults or events shall affect this lease only if caused by or happening to Assignee or subleasee.

C.   Upon such termination by Landlord and opportunity to cure as stated, Tenant will surrender possession of the Leased Premises to Landlord and Landlord shall have all the remedies of a secured party under the laws of the State of Utah. Landlord may then re-enter the Leased Premises and repossess himself thereto and remove all persons and effects therefrom using such force as may be necessary without being guilty of trespass, forcible entry, or detainer or other tort.

18.   RELETTING BY LANDLORD

Landlord, as Tenant's agent, without terminating this lease, upon Tenant's breaching this contract, may, at Landlord's option, enter upon and rent the Leased Premises at the best price obtainable by reasonable effort at the best fair market rate Landlord can obtain. Landlord has the continuing duty to mitigate damages in the event of Tenant's breach by exerting reasonable efforts to relet the Leased Premises and in the event of any such reletting, Landlord shall credit Tenant the sums received pursuant to any such reletting against the accelerated rent that may be due to Landlord as damages under Section 17(A) above. Tenant shall be liable to Landlord for the deficiency, if any, between Tenant's rent thereunder and the price obtained by Landlord on reletting, plus all costs and reasonable attorney's fees incurred by or against Landlord in enforcing any of the provisions of this lease.

SELLER
INITIAL

PAGE 35

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

19.   MORTGAGEE'S RIGHTS
Tenant's rights shall be subject to any bona fide mortgage or deed to secure debt which is now, or may thereafter be placed upon the Leased Premises by Landlord.

Landlord reserves the right to subject and subordinate this lease at all times to the lien of any mortgage or mortgages now or hereafter placed upon Landlords interest in the said Leased Premises and on the land and buildings of which the said Leased Premises are a part or upon any buildings hereafter placed upon the land of which the Leased Premises form a part. Tenant covenants and agrees to execute and deliver upon demand such further instrument or instruments subordinating this lease to the lien of any such mortgage or mortgages as shall be desired by Landlord and any mortgagees or proposed mortgagees and hereby irrevocably appoints Landlord the attorney-in-fact of Tenant, to execute and deliver any such instrument or instruments for and in Tenant's name.

20.   NO ESTATE IN LAND
This contract shall create the relationship of Landlord and Tenant between the parties thereto; no estate shall pass out of Landlord.

21.   HOLDING OVER
If Tenant remains in possession of Leased Premises after expiration of the term hereof, with Landlord's acquiescence and without any express agreement of parties, Tenant shall be a tenant-at-will at the rental rate in effect at the end of the lease term, and there shall be no renewal of this lease by operation of law.

22.   ATTORNEYS' FEES AND COSTS
In any enforcement action by either party hereunder, the prevailing party shall be entitled to reasonable attorneys' fees and costs thereof.

23.   SERVICE OF NOTICE
Tenant thereby appoints as Tenant's agent to receive service of all dispossessory or distraint proceedings and notices thereunder, and all notices required under this lease, the person in charge of Leased Premises at the time, or occupying said Leased Premises, and if no person is in charge of, or occupying said Leased Premises, then such service or notice may be made by attaching the same on the main entrance to said Leased Premises. A copy of all notices under this lease shall also be sent to Tenant's last known address, if different from said Leased Premises.

24.   WAIVER OF RIGHTS
No failure of Landlord or Purchaser to exercise any power given them hereunder, or to insist upon strict compliance by the other party with such other party's obligations hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Landlord's or Purchaser's right to demand exact compliance with the terms hereof.

25.   DEFINITIONS
"Landlord", as used in this lease, shall include first party; any heirs; representatives; assigns; and successors in title to the Leased Premises. "Tenant" shall include second party, heirs and representatives, and if this lease shall be validly assigned or sublet, shall include Tenant's assignees or subleasees, as to the Leased Premises covered by such assignment or sublease. "Landlord", "Tenant", include male and female, singular and plural, corporation, partnership or individual, as may fit the particular parties.

26.   RIGHT OF FIRST REFUSAL
Should Landlord, during the term of this lease, or any extension hereof, elect to sell all or any portion of the Leased Premises, and provided Tenant is not in default of this Agreement, Tenant shall have the right of first refusal to meet any bona fide offer of sale on the same terms and conditions of such

SELLER
INITIAL 

PAGE 36

PURCHASER
INITIAL
MS

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

offer. Upon Tenant's failure to meet such bona fide offer within thirty (30) days after receipt of written notice, then such option may be exercised by an individual stockholder of Tenant (provided Tenant is a corporation), but such stockholder must meet such bona fide offer within ten (10) days following the end of the original thirty (30) days allowed Tenant. Upon failure to meet such bona fide offer (by Tenant and/or a stockholder of Tenant) within the aforementioned time periods, then Landlord shall be free to sell the Leased Premises or portion thereof to that third person or party in accordance with the terms and conditions of that offer. Should this right of first refusal not be exercised as provided herein, the option to purchase and the lease renewal, as hereinafter described, shall terminate and become null and void. However, should that original bona fide offer not be finalized, then this right of first refusal shall be automatically reinstated.

27.    OPTION TO PURCHASE
Provided Tenant is not in default of the Asset Purchase Agreement (including any Addenda attached thereto) and provided Tenant has provided Landlord with a minimum of ninety (90) days written notice of Tenant's intent to purchase the leased property, Tenant shall have the continuing and unilateral option to purchase the leased property any time following the Effective Date hereof, for a mutually agreed upon consideration. Should Tenant and Landlord fail to agree on the purchase price, then the purchase price shall be determined by appraisal; Landlord and Tenant shall each appoint one appraiser who in turn shall appoint a third appraiser, and the average of the closest two appraisals shall determine the purchase price for this option. Landlord and Tenant shall each pay the cost of their own appraisal. The cost of the third appraisal shall be shared equally by Tenant and Landlord. Tenant shall have the right to assign this option (with the prior written consent of Landlord, which may not be unreasonably withheld) and such option shall inure to the benefit of the respective successors and assigns of Tenant.

For purposes of this section, default shall be defined as any violation or breach of Tenant's obligations under the Asset Purchase Agreement and accompanying Addenda, which has not been cured within the time permitted under this Agreement.

28.    LEASE RENEWAL
Tenant shall have the option to renew this lease for an additional term of five (5) years beginning the first day following the Original Term. Tenant shall notify Landlord of Tenant's intent to renew this lease three (3) months prior to the end of the Original Term. The new rental amount shall be determined by mutual consent of Landlord and Tenant provided, however, that the new rental amount shall not be increased by more than 10% of the most recent rental amount charged by Landlord to Tenant.

29.    MUTUAL RELEASE AND WAIVER
Landlord and Tenant each hereby release and relieve the other, and waive their entire claim of recovery for loss or damage to property arising out of or incident to fire, lightning, and the perils included in the extended coverage endorsement to their respective fire insurance policies, in, or about the Leased Premises, whether due to the negligence of either party, their agents, or employees, or otherwise.

30.    DEATH AND DISABILITY OF TENANT
Landlord and Tenant acknowledge that Tenant's intended use of the demised Leased Premises is conditioned upon Tenant's ability to pursue Tenant's professional practice. In the event Tenant becomes disabled and is unable to continue to practice, and is qualified for full disability benefits under the terms of any professional disability insurance coverage, or if Tenant should die, then Tenant or Tenant's estate shall have the right to terminate this lease by giving Landlord notice, in writing, of Tenant's intent to terminate this lease, and this lease will automatically terminate six months (6) from the date of such notice, if not otherwise expired.

SELLER 
INITIAL

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

31.  ADDITIONS AND MODIFICATIONS
     Any additions and modifications to this lease shall be listed on the attached "ADDITIONAL
     PROVISIONS AND MODIFICATIONS" addendum.

THIS LEASE contains the entire agreement of the parties thereto and no representations, inducements, promises, or agreements, oral or otherwise, between the parties, not embodied therein, shall be of any force or effect.

IN WITNESS WHEREOF, the parties herein have thereunto set their hands and seals, the day and year first above written.

Witness

Landlord:

Benjamin R. Hulse, D.D.S.

Tenant:
Swan Pediatric Dental, P.C.

Witness

by _____
Matthew A. Swan, D.D.S.
Title: President and CEO

SELLER
INITIAL

PAGE 38

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

# ADDENDUM

## PROFESSIONAL OFFICE LEASE AGREEMENT
## NEPHI OFFICE

THIS LEASE, dated _December 19th_, 2018 (the "Lease"), by and between Hulse Dentistry , LLC (hereinafter referred to as the "Landlord"); and Swan Pediatric Dental, P.C., (hereinafter referred to as the "Tenant");

## WITNESSETH:

1.  PREMISES
    Landlord, for and in consideration of the rents, covenants, agreements, and stipulations hereinafter mentioned, reserved, and contained, to be paid, kept, and performed by Tenant, has leased and rented, and by these presents does lease and rent, unto Tenant, and Tenant hereby agrees to lease and take upon the terms and conditions which hereinafter appear, an office space (consisting of approximately _____ rentable square feet) located at 54 N Main St., Nephi UT 84648 (which shall, for purposes of this Lease, hereinafter be referred to as the "Leased Premises").

2.  TERM
    To have and to hold the Leased Premises for a term of five (5) years, beginning _December 31 2018_ (the "Effective Date") and ending _December 31 2023_ the "Original Term") at midnight, unless terminated sooner as hereinafter provided.

3.  RENTAL AND SECURITY
    Tenant agrees to pay to Landlord, at Landlord's principal place of business, promptly on the first day of each month, in advance, during the first year of the Original Term, a monthly rental of $3,500.00 plus applicable sales tax (if any). The monthly rental for each subsequent year shall increase by $150.00 (i.e. the monthly rental during year two shall be $3,650.00 plus applicable sales tax (if any), and so forth).

    A.  Tenant shall pay, as additional rental, an amount equal to five percent (5%) of one month's rent as a late penalty payment should Landlord not receive the monthly rental payment within fifteen (15) days after the due date.

    B.  In the event of a bona fide sale of the Leased Premises made expressly subject to this lease, Landlord shall have the right to transfer the security to the purchaser to be held under the terms of this lease.

4.  UTILITY BILLS AND AD VALOREM TAXES

    A.  Tenant shall pay all utility bills, including, but not limited to water, sewer, gas, electricity, fuel, garbage collection and other sanitary services provided to the Leased Premises. If Tenant fails to pay any of said utility bills, Landlord may pay the same and such payment may be added to the rental of the Leased Premises next due as additional rental.

    B.  Tenant shall pay all personal property ad valorem taxes (non-real estate only) due resulting from the occupancy of the Leased Premises by Tenant and. Tenant agrees to hold harmless and indemnify Landlord against any liability on such account. Landlord shall pay all common area maintenance fees and/or condominium association fees, if applicable

SELLER
INITIAL 

PAGE 39

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

5.  USE OF PREMISES
    The Leased Premises shall be used for a professional office space and no other, without the prior written consent of Landlord, which consent shall not be unreasonably withheld. The Leased Premises shall not be used for any illegal purposes, nor in any manner to create any nuisance or trespass nor vitiate the property insurance or increase its rate.

6.  ABANDONMENT OF LEASED PREMISES
    Tenant agrees not to abandon or vacate the Leased Premises during the period of this lease. Unless otherwise provided to the contrary herein, no termination of this lease prior to the normal ending thereof, by lapse of time or otherwise, shall affect Landlord's right to collect rent for the period prior to termination thereof.

7.  REPAIRS BY LANDLORD AND LANDLORD EXPENSES
    Except for repair expenses rendered necessary by the negligence of Tenant, its agents, employees, or invitees, Landlord agrees to promptly repair and keep in good working order the roof, foundations, and the exterior walls of the Leased Premises (exclusive of all glass and exterior doors), underground utility and sewer pipes outside the exterior walls of the building (including those running under the parking lot), the heating and air conditioning units, water heater and any fire protection and sprinkler systems, sidewalks and parking lot.

    A.  Landlord gives to Tenant exclusive control of the Leased Premises and shall be under no obligation to inspect said Leased Premises.

    B.  Tenant shall promptly notify Landlord, in writing, of any known defective condition that Landlord is required to repair, and failure to so report such known defects shall make Tenant responsible to Landlord for any increased liability incurred by Landlord by reason of such failure to report the defective condition. Any such repairs or alterations by Landlord shall be accomplished promptly and in a good and workmanlike manner. All such work shall be completed in such a manner that shall minimize or avoid interference with Tenants use of the Leased Premises.

    C.  If Landlord fails to make such repairs or replacements, then Tenant shall have the right to make such repairs or replacements; Tenant may deduct or retain any reasonable amount so paid out of any rents, provided however, that Tenant shall supply Landlord with an accounting for all such expenses before deducting the same from the rent.

8.  REPAIRS BY TENANT AND TENANT EXPENSES
    Tenant accepts the Leased Premises in its present condition and as suited for the uses intended by Tenant. Landlord is not aware of any defects in or about the Leased Premises as of the Signature Date. Tenant shall, throughout the initial term of this lease and all renewals thereof, at Tenant's expense, maintain the Leased Premises in good order and repair, including the building and other improvements located thereon, except those repairs expressly required to be made by Landlord. Tenant shall be responsible for glass breakage and sign damage unless caused by the negligence or intentional acts of Landlord and/or its agents.

    A.  If Tenant occupies the entire building and is the sole tenant, then Tenant further agrees to care for the grounds around the building, including the mowing of grass and care of shrubs and shall maintain the sidewalks and parking lot free from dirt, snow, ice, rubbish and other obstructions or encumbrances.

    B.  Tenant agrees to return said Leased Premises to Landlord at the expiration or the termination of this lease in as good condition and repair as when first received, natural wear and tear, damage by storm, fire, lightning, earthquake, or other casualty alone excepted.

    C.  Other than the customary materials typically found in dental practices, Tenant shall not, without Landlord's prior written consent, keep on the Leased Premises any substances designated as,

SELLER
INITIAL                                    PAGE 40                                    PURCHASER
                                                                                     INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

or containing components designated as, hazardous, dangerous, toxic or harmful (collectively "hazardous substances"). With respect to any hazardous substances, Tenant agrees to comply with all applicable codes, rules and regulations regarding the handling and disposal of such hazardous substances. Tenant agrees to indemnify Landlord from and against any and all damages, costs or expenses, including the expense of clean-up, disposal, inspection, and/or fines imposed as a result of any hazardous substances introduced on the Leased Premises during this tenancy.

D. Tenant may not make changes to the interior or exterior of the Leased Premises without the written consent of Landlord. Notwithstanding the foregoing, painting or other minor improvements may be made without prior approval.

9. PROPERTY TAXES AND INSURANCE
Landlord shall pay all real estate taxes for the Leased Premises and shall provide and pay for the building property and general liability insurance coverage for the office building. Tenant shall pay upon demand, as additional rental during the term of this lease and any extension or renewal thereof, any increases in all insurance and taxes (and any other governmental charges to the Leased Premises) over the amount charged the first full calendar year this lease is in effect.

A. In the event the Leased Premises are less than the entire property assessed, then the amount due by Tenant for any such increases called for by the above paragraph shall be determined by proration on the basis of the rentable floor area of the Leased Premises bears to the rentable floor area of the entire property assessed. Tenant's pro rata portion, as provided therein, shall be payable within fifteen (15) days after receipt of notice from Landlord as to the amount due.

B. Landlord shall submit to Tenant a copy of the actual statements received from any present and future taxing authority as they become due. Landlord shall also submit to Tenant a copy of the insurance statement relating to the Leased Premises.

10. DESTRUCTION OR DAMAGE TO THE PREMISES
If the Leased Premises are totally destroyed by storm, fire, lightning, earthquake, or other casualty, then this lease shall terminate as of the date of such destruction and rental shall be accounted for as between Landlord and Tenant as of that date.

A. If the Leased Premises are damaged but not wholly destroyed, and the Leased Premises may be safely used for providing dental services, then rental shall abate in such proportion as use of the Leased Premises has been destroyed and Landlord shall, without delay, promptly restore the Leased Premises to substantially the same condition as before such damage, whereupon full rental shall recommence.

B. Subject to any responsibility of Landlord to provide any building property or general liability insurance pursuant to Section 9 above, Landlord shall not be responsible or liable to Tenant for any loss or damage that may be occasioned by or through the acts or omissions of persons occupying adjoining property or any part of the building of which the Leased Premises are a part, or for any loss or damage resulting to Tenant or Tenant's property from bursting, stoppage or leaking of water, gas, sewer or steam pipes.

11. INDEMNITY
Tenant agrees to hold harmless and indemnify Landlord against all claims for damages to persons or property attributable to Tenant's occupancy of the Leased Premises or use thereof authorized by Tenant, and all expenses incurred by Landlord as a result thereof including reasonable attorneys' fees and court costs, unless caused by the negligence or intentional acts of Landlord and/or its agents or representative.

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

A. Tenant shall at Tenants expense, during the entire term of this lease, maintain in full force and effect, a general liability insurance policy for public liability and property damage with respect to the Leased Premises and the business operated by Tenant. Such insurance shall include bodily injury in sums of not less than $500,000 per person and $1,000,000 per occurrence, and property damage losses of not less than $50,000. Such policy shall cover office contents and shall include plate glass coverage for all windows and glass doors located on the Leased Premises. Landlord shall be named as an additional insured on any such policy, to the extent permitted by the insurance carrier.

B. Tenant shall at all times provide Landlord with confirmation that such insurance is in full force and effect. Upon Tenant's failure to provide such insurance, Landlord may, at Landlord's option, obtain such insurance and the cost thereof shall be paid as additional rent due and payable upon the next ensuing rent day.

C. Subject to any responsibility of Landlord to provide any building property or general liability insurance pursuant to Section 9 above, Landlord shall not be liable for any loss or damage to the Leased Premises resulting from fire or other perils due to any cause whatsoever except negligent damage by the Landlord or Landlord's agents, whether or not such insurance is in effect on the Leased Premises.

12. GOVERNMENTAL ORDERS
Tenant agrees, at Tenant's own expense, to promptly comply with all requirements of any legally constituted public authority made necessary by reason of Tenant's occupancy of said Leased Premises. Landlord agrees to promptly comply with any such requirements if not made necessary by reason of Tenant's occupancy.

13. CONDEMNATION
If the Leased Premises, or any portion thereof should be condemned by any legally constituted authority for any purpose, then the term of this lease shall cease from the date when possession thereof is taken, and rental shall be accounted for as between Landlord and Tenant as of said date. Such termination, however, shall be without prejudice to the rights of either Landlord or Tenant, to the extent of their respective interest, to recover compensation and damage caused by condemnation from the condemnor. Neither party shall have any rights in any award made to the other by any condemnation authority, notwithstanding termination of this lease.

14. ASSIGNMENT AND SUBLETTING
Tenant may assign this lease or sublease all or portions of the Leased Premises to others if such operation is within the purposes for which the Leased Premises may be used; provided however, that such assignment or sublease shall require the prior written consent of Landlord, which shall not be unreasonably withheld.

C. Consent to any assignment or sublease shall not destroy this restrictive provision, and all later assignments or subleases shall be made likewise only on the prior written consent of Landlord.

D. Assignee of Tenant, at option of Landlord, shall become directly liable to Landlord for all obligations of Tenant hereunder, but no sublease or assignment by Tenant shall relieve Tenant of any liabilities hereunder. If any subtenant of Tenant should fail to surrender possession of the Leased Premises by the end of the term of this lease, such failure shall not constitute a "holding over" by Tenant so as to impose any liability on Tenant.

15. REMOVAL OF EQUIPMENT AND TRADE FIXTURES
Tenant may (if not in material default of this lease) within thirty (30) days prior to the expiration of this lease, or any extension thereof, remove all removable, non-permanent trade fixtures, such as equipment and modular cabinetry installed by Tenant, provided Tenant repairs all damage to Leased Premises caused by such removal. All leasehold improvements including plumbing, electrical and

SELLER
INITIAL 

PAGE 42

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

carpentry improvements, built-in cabinetry and sinks, and any other property not removed by Tenant at the termination of this lease shall become the property of Landlord.

16.   SECURITY INTEREST
As security for the payment of rent and other charges becoming due hereunder, Tenant hereby grants to Landlord a security interest in all the inventory and equipment on the Leased Premises during the term of this lease; such security interest, however, shall be subordinate to Tenant's bank financing required for the acquisition of the Practice (as described in the attached Asset Purchase Agreement), if required by that bank. The Landlord agrees to execute an agreement whereby Landlord will subordinate Landlord's lien or liens, statutory or otherwise, arising out of this lease, to enable Tenant to obtain financing for additional or replacement equipment, if required to do so by a lender.

17.   CANCELLATION OF LEASE BY LANDLORD

A.  It is mutually agreed that in the event:
    (iv)   Tenant shall default in the payment of rent, including additional rent, therein reserved, when due, and fails to cure the default within ten (10) days after written notice thereof from Landlord; or
    (v)    Tenant shall be in material default in performing any of the terms or provisions of this lease other than the provisions requiring the payment of rent, and fails to cure such default within thirty (30) days after the date of receipt of written notice of default from Landlord; or
    (vi)   if Tenant's effects should be levied upon or attached under process against Tenant and not satisfied or dissolved within thirty (30) days after written notice from Landlord to Tenant to obtain satisfaction thereof; then,

in any of said events, Landlord, at Landlord's option, may at once, or within six (6) months thereafter (but only during continuance of such default or condition) terminate this lease by written notice to Tenant, whereupon this lease shall end; upon such default, the remainder of all rental payments due under the term of this lease shall accelerate and become immediately due and payable to Landlord.

B.  After an authorized assignment or subletting of the entire Leased Premises covered by this lease, the occurring of any of the foregoing defaults or events shall affect this lease only if caused by or happening to Assignee or subleasee.

C.  Upon such termination by Landlord and opportunity to cure as stated, Tenant will surrender possession of the Leased Premises to Landlord and Landlord shall have all the remedies of a secured party under the laws of the State of Utah. Landlord may then re-enter the Leased Premises and repossess himself thereto and remove all persons and effects therefrom using such force as may be necessary without being guilty of trespass, forcible entry, or detainer or other tort.

18.   RELETTING BY LANDLORD
Landlord, as Tenant's agent, without terminating this lease, upon Tenant's breaching this contract, may, at Landlord's option, enter upon and rent the Leased Premises at the best price obtainable by reasonable effort at the best fair market rate Landlord can obtain. Landlord has the continuing duty to mitigate damages in the event of Tenant's breach by exerting reasonable efforts to relet the Leased Premises and in the event of any such reletting, Landlord shall credit Tenant the sums received pursuant to any such reletting against the accelerated rent that may be due to Landlord as damages under Section 17(A) above. Tenant shall be liable to Landlord for the deficiency, if any, between Tenant's rent thereunder and the price obtained by Landlord on reletting, plus all costs and reasonable attorney's fees incurred by or against Landlord in enforcing any of the provisions of this lease.

SELLER
INITIAL

PAGE 43

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

19. MORTGAGEE'S RIGHTS
Tenant's rights shall be subject to any bona fide mortgage or deed to secure debt which is now, or may thereafter be placed upon the Leased Premises by Landlord.

Landlord reserves the right to subject and subordinate this lease at all times to the lien of any mortgage or mortgages now or hereafter placed upon Landlords interest in the said Leased Premises and on the land and buildings of which the said Leased Premises are a part or upon any buildings hereafter placed upon the land of which the Leased Premises form a part. Tenant covenants and agrees to execute and deliver upon demand such further instrument or instruments subordinating this lease to the lien of any such mortgage or mortgages as shall be desired by Landlord and any mortgagees or proposed mortgagees and hereby irrevocably appoints Landlord the attorney-in-fact of Tenant, to execute and deliver any such instrument or instruments for and in Tenant's name.

20. NO ESTATE IN LAND
This contract shall create the relationship of Landlord and Tenant between the parties thereto; no estate shall pass out of Landlord.

21. HOLDING OVER
If Tenant remains in possession of Leased Premises after expiration of the term hereof, with Landlord's acquiescence and without any express agreement of parties, Tenant shall be a tenant-at-will at the rental rate in effect at the end of the lease term, and there shall be no renewal of this lease by operation of law.

22. ATTORNEYS' FEES AND COSTS
In any enforcement action by either party hereunder, the prevailing party shall be entitled to reasonable attorneys' fees and costs thereof.

23. SERVICE OF NOTICE
Tenant thereby appoints as Tenant's agent to receive service of all dispossessory or distraint proceedings and notices thereunder, and all notices required under this lease, the person in charge of Leased Premises at the time, or occupying said Leased Premises, and if no person is in charge of, or occupying said Leased Premises, then such service or notice may be made by attaching the same on the main entrance to said Leased Premises. A copy of all notices under this lease shall also be sent to Tenant's last known address, if different from said Leased Premises.

24. WAIVER OF RIGHTS
No failure of Landlord or Purchaser to exercise any power given them hereunder, or to insist upon strict compliance by the other party with such other party's obligations hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Landlord's or Purchaser's right to demand exact compliance with the terms hereof.

25. DEFINITIONS
"Landlord", as used in this lease, shall include first party; any heirs; representatives; assigns; and successors in title to the Leased Premises. "Tenant" shall include second party, heirs and representatives, and if this lease shall be validly assigned or sublet, shall include Tenant's assignees or subleasees, as to the Leased Premises covered by such assignment or sublease. "Landlord", "Tenant", include male and female, singular and plural, corporation, partnership or individual, as may fit the particular parties.

26. RIGHT OF FIRST REFUSAL
Should Landlord, during the term of this lease, or any extension hereof, elect to sell all or any portion of the Leased Premises, and provided Tenant is not in default of this Agreement, Tenant shall have the right of first refusal to meet any bona fide offer of sale on the same terms and conditions of such

SELLER
INITIAL 

PAGE 44

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

offer. Upon Tenant's failure to meet such bona fide offer within thirty (30) days after receipt of written notice, then such option may be exercised by an individual stockholder of Tenant (provided Tenant is a corporation), but such stockholder must meet such bona fide offer within ten (10) days following the end of the original thirty (30) days allowed Tenant. Upon failure to meet such bona fide offer (by Tenant and/or a stockholder of Tenant) within the aforementioned time periods, then Landlord shall be free to sell the Leased Premises or portion thereof to that third person or party in accordance with the terms and conditions of that offer. Should this right of first refusal not be exercised as provided herein, the option to purchase and the lease renewal, as hereinafter described, shall terminate and become null and void. However, should that original bona fide offer not be finalized, then this right of first refusal shall be automatically reinstated.

27.  OPTION TO PURCHASE
Provided Tenant is not in default of the Asset Purchase Agreement (including any Addenda attached thereto) and provided Tenant has provided Landlord with a minimum of ninety (90) days written notice of Tenant's intent to purchase the leased property, Tenant shall have the continuing and unilateral option to purchase the leased property any time following the Effective Date hereof, for a mutually agreed upon consideration. Should Tenant and Landlord fail to agree on the purchase price, then the purchase price shall be determined by appraisal; Landlord and Tenant shall each appoint one appraiser who in turn shall appoint a third appraiser, and the average of the closest two appraisals shall determine the purchase price for this option. Landlord and Tenant shall each pay the cost of their own appraisal. The cost of the third appraisal shall be shared equally by Tenant and Landlord. Tenant shall have the right to assign this option (with the prior written consent of Landlord, which may not be unreasonably withheld) and such option shall inure to the benefit of the respective successors and assigns of Tenant.

For purposes of this section, default shall be defined as any violation or breach of Tenant's obligations under the Asset Purchase Agreement and accompanying Addenda, which has not been cured within the time permitted under this Agreement.

28.  LEASE RENEWAL
Tenant shall have the option to renew this lease for an additional term of five (5) years beginning the first day following the Original Term. Tenant shall notify Landlord of Tenant's intent to renew this lease three (3) months prior to the end of the Original Term. The new rental amount shall be determined by mutual consent of Landlord and Tenant provided, however, that the new rental amount shall not be increased by more than 10% of the most recent rental amount charged by Landlord to Tenant.

29.  MUTUAL RELEASE AND WAIVER
Landlord and Tenant each hereby release and relieve the other, and waive their entire claim of recovery for loss or damage to property arising out of or incident to fire, lightning, and the perils included in the extended coverage endorsement to their respective fire insurance policies, in, or about the Leased Premises, whether due to the negligence of either party, their agents, or employees, or otherwise.

30.  DEATH AND DISABILITY OF TENANT
Landlord and Tenant acknowledge that Tenant's intended use of the demised Leased Premises is conditioned upon Tenant's ability to pursue Tenant's professional practice. In the event Tenant becomes disabled and is unable to continue to practice, and is qualified for full disability benefits under the terms of any professional disability insurance coverage, or if Tenant should die, then Tenant or Tenant's estate shall have the right to terminate this lease by giving Landlord notice, in writing, of Tenant's intent to terminate this lease, and this lease will automatically terminate six months (6) from the date of such notice, if not otherwise expired.

SELLER
INITIAL

PAGE 45

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

31. ADDITIONS AND MODIFICATIONS
Any additions and modifications to this lease shall be listed on the attached "ADDITIONAL PROVISIONS AND MODIFICATIONS" addendum.

THIS LEASE contains the entire agreement of the parties thereto and no representations, inducements, promises, or agreements, oral or otherwise, between the parties, not embodied therein, shall be of any force or effect.

IN WITNESS WHEREOF, the parties herein have thereunto set their hands and seals, the day and year first above written.

Witness

Landlord:
Hulse Dentistry, LLC

by
Benjamin R. Hulse, D.D.S.

Witness

Tenant:
Swan Pediatric Dental, P.C.

by
Matthew A. Swan, D.D.S.
Title: President and CEO

SELLER
INITIAL

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

# ADDENDUM

Attached to and made a part of that certain Asset Purchase Agreement by and between Hulse Dentistry , LLC and Benjamin R. Hulse, D.D.S. and Swan Pediatric Dental, P.C.

## UNCONDITIONAL GUARANTY

Each undersigned guarantor does hereby warrant that each has the necessary authority and legal capacity to enter into and execute this Asset Purchase Agreement as well as each of the Addenda attached hereto on behalf of Swan Pediatric Dental, P.C. and, in addition, each undersigned guarantor absolutely and unconditionally personally guarantees the performance of Swan Pediatric Dental, P.C. as to the respective obligations, warranties and covenants (including but not limited to any debts and financial obligations of Swan Pediatric Dental, P.C. as such relate to Seller) as set forth in the Asset Purchase Agreement and each of the Addenda attached hereto. If the undersigned consists of more than one guarantor then each guarantor shall be jointly and severally liable with respect to each of the guaranteed obligations of Swan Pediatric Dental, P.C. including, without limitation, debts and financial obligations of Swan Pediatric Dental, P.C. as such relate to Seller.

_____
Witness

_____
Matthew A. Swan, D.D.S.

SELLER
INITIAL

PAGE 47

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

# ADDENDUM

Attached to and made a part of that certain Asset Purchase Agreement by and between Hulse Dentistry , LLC and Benjamin R. Hulse, D.D.S. and Swan Pediatric Dental, P.C.

## PERSONAL ACKNOWLEDGEMENTS AND WARRANTIES

The undersigned hereby acknowledge, warrant and agree as follows:

A. The patients of the Practice are not likely qualified to make any clinical judgment as to the quality and/or appropriateness of services provided them by the Seller (unless such patient is a qualified, licensed dentist). In addition, it is acknowledged that making clinical judgments relating to services rendered by the Seller is very difficult for anyone to assess without first knowing the facts and specific conditions that existed at the time such services were rendered by the Seller. Therefore the undersigned agree:

  (i) to promptly notify the Seller (or the legal representative of the Seller) of any patient claim that the Seller has warranted a service and/or that the Seller rendered a defective service;

  (ii) to make a reasonable effort to first notify the Seller (or the legal representative of the Seller) of any patient claim of a defective service rendered by the Seller before recommending any corrective treatment options to the patient;

  (iii) not to represent to any former patient of the Seller that any defective treatment was provided by the Seller without first having actual evidence (by usual and customary clinical standards) that corrective or replacement treatment is required, and not without providing advance notice to the Seller of such need for corrective or replacement treatment.

B. That should any defective treatment be acknowledged by the Seller (or by the legal representative of the Seller) or determined through arbitration, the Seller (or a qualified, licensed representative of the Seller) shall be allowed, at the option and expense of the Seller and with the consent of the patient, access to the Practice (at a time mutually agreed to by the parties) for the purpose of performing such corrective treatment (but in no event shall such treatment create an agency relationship between the Seller and  the Purchaser and/or the undersigned); or, if mutually agreed, the Purchaser's staff will provide such treatment and the Purchaser shall be paid by the Seller, an amount representing the usual and customary fee of the Purchaser for such treatment, less any portion of such fee that was paid by the patient to Purchaser and/or the undersigned.

C. That, unless at the sole expense of the Purchaser, the undersigned agree that no patient will be refunded of any fee or any part of a fee that was paid by a patient of the Practice for services rendered by the Seller without the prior written consent of the Seller. Should the Seller consent to such a refund, then the Seller shall pay such refund directly to the patient but such refund shall not, in any way, be construed as recompense and/or an admission by the Seller to having rendered a defective service to the patient.

_____
Witness

_____
Matthew A. Swan, D.D.S.

SELLER
INITIAL

PAGE 48

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

# ADDENDUM

Attached to and made a part of that certain Asset Purchase Agreement by and between Hulse Dentistry , LLC and Benjamin R. Hulse, D.D.S. and Swan Pediatric Dental, P.C.

## ADDITIONAL PROVISIONS AND MODIFICATIONS

Any provisions set forth in the attached Asset Purchase Agreement and/or its Addenda that are contrary to the provisions set forth in this Addendum shall be void and have no effect.

SELLER
INITIAL

PURCHASER
INITIAL

APA - HULSE / SWAN PEDIATRIC DENTAL, P.C.

# ADDENDUM

## COMPANY RESOLUTION

CONSENT IN LIEU OF MEETING
OF THE
MEMBERS
AND
MANAGERS
OF

Hulse Dentistry , LLC

The undersigned, being all of the member(s) and manager(s) of Hulse Dentistry , LLC ("Company"), hereby consent to and take the following action and adopt the following resolution pursuant to the rules and regulations of the Company and the applicable statutes of the State of Utah:

RESOLVED, that the members and managers of the Company hereby approved the form, terms, and provisions of the Asset Purchaser Agreement between Benjamin R. Hulse, D.D.S. and the Company, as Sellers, and Swan Pediatric Dental, P.C., as Purchaser, and all Addenda related thereto (collectively, the "Agreements"), as such Agreements are attached hereto, and hereby authorizes and directs Benjamin R. Hulse, D.D.S. to sign and enter into all such Agreements, on behalf of the Company, and any others that are necessary and proper for the sale of any Practice Assets owned by Benjamin R. Hulse, D.D.S. or Hulse Dentistry , LLC.

_____
Date

by _____
Benjamin R. Hulse, D.D.S.,
sole member and sole manager

_____
Date

by _____

_____
Date

by _____

_____
Date

by _____

_____
Date

by _____

SELLER
INITIAL 

PAGE 50

PURCHASER
INITIAL
MS

# EXHIBIT B

Langdon T. Owen, Jr. (2494)
COHNE KINGHORN
111 East Broadway, 11ᵗʰ Floor
Salt Lake City, Utah 84111
Telephone: (801) 363-4300
Facsimile (801) 363-4378

*Arbitrator*

## AMERICAN ARBITRATION ASSOCIATION
## COMMERCIAL TRIBUNAL

| | |
|---|---|
| MATTHEW A. SWAN, an individual; and SWAN PEDIATRIC DENTAL, LLC, a limited liability company,<br><br>      Claimants,<br><br>vs.<br><br>HULSE DENTISTRY, LLC, a limited liability company, and BENJAMIN R. HULSE, an individual,<br><br>      Respondents. | **FINAL AWARD**<br><br>Case No. 01-19-0002-9551<br><br>Langdon T. Owen, Jr. |

I, Langdon T Owen, Jr., the undersigned Arbitrator, having been designated in accordance with the arbitration provision (Section 29) contained in the Asset Purchase Agreement entered into between Swan Pediatric Dental, LLC as buyer (guaranteed by Matthew A. Swan, which guarantee was made a part of the agreement) and the sellers, Hulse Dentistry, LLC and Benjamin R. Hulse, which was executed on December 19, 2018 effective December 31, 2018, and having been duly sworn, and having duly heard the proofs and allegations of the Claimants and the Respondents, and the matter having been fully briefed by the parties, AWARD as follows:

A. Langdon T. Owen, Jr. was appointed and sworn as arbitrator in the above-styled matter pursuant to the arbitration agreement of the parties contained in the Asset Purchase Agreement executed December 19, 2018 and the Commercial Arbitration rules of the American Arbitration Association. Claimants were represented by Peter Donaldson, Cole Crowther, and John Tipton of Durham, Jones and Pinegar. Respondents were represented by Steve Sumsion and Cameron Christensen of Sumsion Business Law.

This matter was ordered to arbitration on October 18, 2019, by Judge James R. Taylor of the Fourth District Court for Utah County, Utah, Case No. 190401392. Claimants filed their

demand for arbitration with the American Arbitration Association seeking damages of not less than $75,000 on December 13, 2019. Respondents answered and counter claimed for $656,931.36. Claimant responded to the counter-claim on December 20, 2019. A preliminary conference was held and a Scheduling Order was entered on December 2, 2019 and was subsequently amended and supplemented. During the course of proceedings, the Arbitrator entered a number of orders, including:

> A Stipulated Protective Order (January 10, 2020), Order on Respondents' Request for Permission to File Motion for Partial Summary Judgment (May 1, 2020, denying the request), Order on Motion to Amend Counterclaim (June 5, 2020, denying the motion).

The hearing in this matter was held July 8, 9, and 10, 2020 in Lehi, Utah. Claimants were present with counsel, and Respondents were present with counsel. The parties filed pre-hearing and post-hearing briefs and affidavits or declarations regarding attorney fees and costs.

B. The arbitrator finds:

> (1) No known conflict of interest exists which would disqualify the arbitrator.

> (2) The parties entered into a valid agreement providing that this matter shall be resolved through binding arbitration in accordance with the applicable rules of the AAA. Claimant filed a claim with the AAA and it was served on the Respondent in accordance with such rules. The matter has proceeded in accordance with such rules.

> (3) The parties have had the opportunity to present all evidence and information to the arbitrator. The arbitrator has reviewed all evidence and information submitted in this case. The information and evidence submitted support the issuance of this Award.

C. Based on the evidence and the foregoing procedural findings, the arbitrator makes the following binding award in full and complete resolution of all claims and issues of the parties with respect to this matter.

(1) Claimant is awarded $345,000 against Respondents jointly and severally for breach of contract and defamation.

(2) The Administrative fees of the AAA totaling $20,575 are to be borne entirely by Respondents jointly and severally. The Compensation of the Arbitrator totaling $18,760, is to be borne entirely by Respondents. Therefore, Respondents shall reimburse Claimant the amount of $17,630, representing filing fees and arbitrator compensation Claimant previously advanced to the AAA.

(3) Attorneys' fees and costs in the amount of $310,739 are awarded to Claimant against Respondents jointly and severally.

(4) The amounts awarded above to Claimant under C(1), (2), and (3) total $673,369, which total shall bear interest on the unpaid balance from the day after the hearing, July 10, 2020, at the rate of 3.53% per annum, the post-judgment interest rate applicable in Utah.

(5) Claimants are granted a permanent injunction against both Respondents ordering them to refrain from publishing false and defamatory statements about either Claimant or the dental practice of Dr. Swan.

(6) No punitive damages are awarded.

(7) The counterclaims of Respondents are dismissed with prejudice.

(8) This Award is in full settlement of all claims submitted to this arbitration. All claims not expressly granted are denied.

D.  The reasons for the award are:

The Asset Purchase Agreement was breached by Dr. Hulse and Hulse Dentistry, LLC (the "Hulse" parties"), but not by Dr. Swan, or Swan Pediatric Dental, LLC (the "Swan parties"). The breach caused damages to Dr. Swan and Swan Pediatric Dental, LLC.

The Hulse parties breached the agreement by sending collection letters in July of 2019 that did not "clearly notify" the patient that Seller [the Hulse parties] was acting for Sellers' own account and not by or on behalf of Purchaser [the Swan parties] as was required under the Asset Purchase Agreement.  The letters were misleading and in many cases were in error.  The Hulse parties say that the erroneous amounts billed were agreed by the Swan parties but this is not so; just because an employee from Swan helped Dr. Hulse with his attempt to establish amounts does not mean that the Swan parties agreed to the amounts or that the employee had authority to agree and does not relieve Dr. Hulse of the responsibility to assure the bills he sends relating to the Hulse parties own accounts are accurate. The letters and the errors caused patients distress and resulted in angry complaints and damaged the goodwill of the practice for which goodwill the Swan parties had paid $1,076,200.  The letters were misleading in that they were drafted to appear to come from "Nephi Smiles" and "Salem Smiles," the practices now belonging to the Swan parties after the asset purchase, and they were not signed by Dr. Hulse or any person. They did not contain the required notification. The Swan parties had to expend considerable effort to try to minimize the damage.

The damage amounted to $345,000 as demonstrated to a reasonable degree of certainty by the credible expert evidence offered by the Swan parties.  The challenges to

the evidence of the expert of the Swan parties by the expert of the Hulse parties were not enough to change this conclusion. The statistical analysis by an expert for the Hulse parties only showed that the evidence might not meet the highest standard for statistical analysis since there might be a difference between the class of patients receiving the letters, compared to those not receiving them. The Hulse parties' statistical expert did not demonstrate that there was an actual difference or that the Swan parties' expert did not succeed in showing damages with reasonable certainty. The statistical expert approved of the methods of the Swan parties' expert but suggested that there might be some possible issue in the sampling, but that such an issue actually existed was not demonstrated.

The Hulse parties also published false and defamatory statements about the Swan parties. This also damaged the reputation and thus the goodwill of the Swan parties. Such damage appears sufficiently compensated by the $345,000 award so no additional separate award of damage is awarded. However, an injunction against further such conduct is appropriate. Nonmonetary relief is specifically allowed under the agreement at section 29B(ii).

The Swan parties claim that the Hulse parties breached the warranties in the agreement by failing to disclose that an explicit photograph was on a computer accessible to patients, including children. No patients appear to have actually viewed the photo. The Swan parties tried to avoid this matter being raised in the proceedings in order to avoid embarrassment to Dr. Hulse who knew the person in the photo, and they told the Hulse parties that they wanted to avoid the matter. This was unreasonably interpreted by the Hulse parties as a blackmail threat which led to a defamatory publication by the Hulse parties using the term "blackmail." It was the Hulse parties who raised the matter in the hearing. Although the failure to disclose this matter might breach a warranty, the Swan parties did not show any damages, so no damages are awarded for this.

The Hulse parties breached the arbitration provision of the agreement by first suing rather than bringing the claim under the arbitration clause. This caused damage to the Swan parties through the need to expend attorneys' fees and costs. This damage is compensated in the award of attorneys' fees and costs.

The Hulse parties changed patient records in a way, that if not caught, would have increased payments to the Hulse parties in the turning over of accounts receivable collections to the Hulse parties by the Swan parties. The explanation offered by the Hulse parties of why the changes should not be seen as improper were not credible. However, the improper charges were caught and no actual damage resulted, so no award of damages is made with request to this matter.

The counterclaims of the Hulse parties are for alleged breach of the Asset Purchase Agreement by the Swan parties, but those counterclaims are without merit.

The Asset Purchase Agreement allowed the Swan parties to collect the accounts receivable collected by the Hulse parties for a limited period of time (a 90-day "Collection Period"), and, if desired, to borrow the proceeds. The Swan parties did not buy accounts receivable. The Swan parties collected accounts receivable of the Hulse parties and turned over all the proceeds to them. The Hulse parties did not meet their burden of proof on their claim that some amounts collected were not paid over to the Hulse parties.

The agreement did not require any specific amount to be collected. Except to provide that "Seller agrees that Purchaser will not use extraordinary methods of collection," the agreement does not provide any standard relating to collections, but at the end of the 90-day "Collection Period" after closing of the asset sale, "responsibility to collect accounts receivable is to be returned to the Seller (the Hulse parties) and Seller can then use "any legal method of collection available to Seller." Without a specified standard, a standard of commercial reasonableness would apply, and the Swan parties met that standard in their collection efforts. The Swan parties sent more billings and collected more in the Collection Period than had historically been the case by the Hulse parties and the Swan parties spent a great deal of effort to collect the accounts receivable. That some accounts were not followed-up on does not indicate a lack of commercially reasonable effort, particularly where the Hulse parties had over the years accumulated an unusually large amount of older accounts receivable. The Hulse parties were not prejudiced and suffered no damages, because they themselves could fully collect any accounts after the Collection Period. The expert evidence produced by the Hulse parties did not change these conclusions.

Full control and responsibility for collection was turned over to the Hulse parties after the Collection Period. The assertion by the Hulse parties that the agreement should be interpreted to imply an obligation to allow remote access to the Open Dental software, either under the agreement terms themselves or under the implied covenant of good faith and fair dealing, is not convincing and is not consistent with the express term of the agreement which provided that the Hulse parties "shall have, during normal business hours and upon reasonable written notice, access to the clinical and financial records related to any Accounts Receivable." The Swan parties did provide such access at the offices. The was all that the agreement required. The agreement was silent on remote access to software and although the Swan parties allowed some temporary remote access, they were not bound to do so, and had sufficient reason to terminate the accommodations when the relationship between the parties deteriorated.

The Hulse parties only went to the office a few times for collection efforts and then gave up on such efforts altogether. The Hulse parties at one point objected to the use of a letter which stated that they were not pursuing collections, on the basis that the letter was a Rule 408 settlement document not admissible under the rules of evidence, and have asked for sanctions for the Swan parties disclosing the letter. However, that objection was abandoned at the hearing (see, e.g., transcript 40:20-25) and the letter was

admitted as an exhibit; but even without that letter being taken into account, the other evidence made it clear that the Hulse parties had ceased collection efforts and thus any loss from a lack of collections was not caused by the Swan parties, but by the Hulse parties own failure to mitigate their own losses. No sanctions are imposed for the use of the letter.

The Hulse parties complain that the Swan parties wrote off some Hulse party accounts believed by the Swan parties to be not in fact owing, but the Hulse parties did not show which accounts were involved or the amounts involved, except to estimate them to be about $35,000, and did not show that these accounts were owing and could have been collected at all. Thus, the Hulse parties have not met their burden of proof that there was any breach or that even if there may have been a breach, that any damage resulted from it.

The Hulse parties assert that the Swan parties were obliged to "re-credential" the Hulse parties to allow the submission and collection of insurance claims. However, the agreement says nothing on the matter and although the Swan parties might have been able to do the re-credentialing, not doing so was not a breach. Also, the Hulse parties could have done this for themselves as well and suffered no prejudice or damage where there was plenty of time available to re-credential and submit insurance claims, but they didn't do this for themselves.

*Rest of page left intentionally blank*

The claims for damages by the Hulse parties based on the asserted breaches by the Swan parties (as noted above, there were no such breaches), of $656,931.36 of lost value to accounts receivable reduced to $464,495.06 after crediting $166,548.72 of collections, was not credible and was based on faulty assumptions, such as an assumption of 95% collectability regardless of the age of the accounts. There being no breach by the Swan parties, the evidence on damages becomes moot.

The Asset Purchase Agreement at sections 17 and 29D expressly provides for an award of attorneys' fees and costs, and the fees and costs incurred by the Swan parties are reasonable in this matter and should be awarded. The fees and costs expended by claimant amounted to $328,369 which has been reduced in the fee and cost part of the award to $310,739 because $17,630 of the costs claimed relate to payments to the AAA which are separately accounted for in this award. This award includes all fees and costs incurred by the Swan parties, including in the initial lawsuit, in mediation, and in arbitration because this is necessary to provide full relief for the Swan parties. Similarly, all costs of arbitration should be awarded against Respondents under section 29B of the agreement.

So ordered and awarded.

Dated: _____August 27, 2020_____

Arbitrator Signature: _____

## CERTIFICATE OF SERVICE

I hereby certify that on _August 27_, 2020, a true and correct copy of the foregoing was served by email on all counsel of record.

ccrowther@djplaw.com;
pdonaldson@djplaw.com;
steve@businesslawutah.com
jenmora@adr.org

_____/s/ Langdon T. Owen, Jr._____

# EXHIBIT C

The Order of the Court is stated below:
Dated:    December 23, 2020        /s/    JAMES R TAYLOR
          12:28:11 PM                      District Court Judge

Peter H. Donaldson (9624)
Cole P. Crowther (16432)
John V. Tipton (17344)
**Dentons Durham Jones Pinegar P.C.**
111 South Main Street, Suite 2400
PO Box 4050
Salt Lake City, UT  84110-4050
Telephone:  (801) 415-3000
peter.donaldson@dentons.com
cole.crowther@dentons.com
john.tipton@dentons.com

*Attorneys for Defendants*

### IN THE FOURTH JUDICIAL DISTRICT COURT
### IN AND FOR UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| HULSE DENTISTRY, LLC, a limited liability company, and BENJAMIN R. HULSE, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> SWAN PEDIATRIC DENTAL, LLC, a limited liability company, and MATTHEW A. SWAN, an individual, <br><br> Defendants. | **ORDER RE: DECEMBER 7, 2020 HEARING** <br><br> Case No. 190401392 <br><br> Judge James R. Taylor |

This matter came before the Court for hearing on Swan Pediatric Dental, LLC and

Matthew A. Swan's (collectively, the "Swan Parties") Motion to Confirm Arbitration Award (the

"Motion to Confirm") against Plaintiffs Hulse Dentistry, LLC and Benjamin R. Hulse

(collectively, the "Hulse Parties"), as well as the Hulse Parties' Motion to Vacate Arbitration

Award (the "Motion to Vacate").  These two motions were filed with respect to the August 27,

2020 Final Arbitration Award (the "Arbitration Award") issued in American Arbitration

Association Case No. 01-19-0002-9551 (Langdon Owen, Arbitrator) (the "Arbitration").

A hearing on the two motions was held on December 7, 2020 via videoconference.  The
Hulse Parties were represented by Steven R. Sumsion, and the Swan Parties were represented by
Peter H. Donaldson and John V. Tipton.  At the conclusion of the December 7, 2020 hearing, the
Court ruled on both motions and directed counsel for the Swan Parties to prepare and submit a
proposed order.

Based on the submissions of the parties and the parties' arguments during the December
7, 2020 hearing, and for the reasons stated by the Court on the record, the Court hereby
determines and orders as follows:

1.  The Motion to Confirm was filed against both of the respondents in the
    Arbitration, Hulse Dentistry, LLC and Dr. Benjamin R. Hulse.

2.  On September 16, 2020, Mr. Sumsion accepted service of the Motion to
    Confirm on behalf of Dr. Hulse, who was not initially named as a party in this
    lawsuit when it was filed in August 2019.  This was requested so that the
    Court would be in a position to confirm the Arbitration Award against both of
    the respondents in the Arbitration, Hulse Dentistry, LLC and Dr. Benjamin R.
    Hulse.

3.  Based on the Court's discussion with counsel at the December 7, 2020
    hearing, counsel for Dr. Hulse does not object to Hulse Dentistry and Dr.
    Hulse being parties to this case, and therefore the Motion to Confirm applies
    to both of these parties.

4.  As outlined in Utah Code § 78B-11-116, the arbitrator in the Arbitration had
    broad authority to not only determine the admissibility, relevance, and

2

materiality of evidence, but also to weigh the evidence and to come to a conclusion.

5.   The alleged procedural and substantive errors during the underlying Arbitration relied upon by the Hulse Parties in support of their Motion to Vacate fall short of what is required under Utah Code § 78B-11-124 to vacate an arbitration award.

6.   All of the arguments made by the Hulse Parties in their Motion to Vacate were based on arguments made to the arbitrator during the Arbitration that were ultimately denied.

7.   The Court finds and concludes that there is no basis to vacate the Arbitration Award under Utah Code § 78B-11-124, and the Motion to Vacate is therefore DENIED.

8.   Because there are no grounds to vacate or otherwise modify the Arbitration Award, pursuant to Utah Code § 78B-11-123, the Motion to Confirm is hereby GRANTED, and the Arbitration Award is hereby CONFIRMED against both Hulse Dentistry, LLC and Dr. Benjamin R. Hulse.

**IT IS SO ORDERED.**

**\*\*\*\*\*\*END OF ORDER\*\*\*\*\*\***

**\*\*\* Entered by the Court on the date indicated by the Court's Seal at the top of the first page\*\*\***

3

SLC_5261112

4

SLC_5261112

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2020, a true and correct copy of the foregoing was filed and therefore served electronically via the Court's electronic filing system on all counsel of record.

*/s/ John V. Tipton*

5

SLC_5261112